**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

CASE NO. 00-6186-CIV-UNGARO-BENAGES

WILTON MANORS STREET SYSTEMS,
INC.,

      Plaintiff,

vs.

CITY OF WILTON MANORS,

      Defendant.

_____/



| | |
|---|---|
| STATE OF FLORIDA | ) |
| | )ss. |
| COUNTY OF LEON | ) |

## AFFIDAVIT OF GARY R. RUTLEDGE

GARY R. RUTLEDGE, after being duly sworn, states as follows:

1.    I am an attorney admitted to practice before this Court and an attorney of record for plaintiff, Wilton Manors Street Systems, Inc. ("Street Systems"), in this action. This Affidavit is submitted in support of plaintiff's motion for summary judgment.

2.    This case involves the patent unconstitutionality of the 1997 sign ordinance of the City of Wilton Manors ("the City") restricting "off-premise" advertising in violation of the principles stated in <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed. 2d 800. A copy of the City's 1997 sign ordinance, as amended and in effect on July 8, 1999, is attached to this Affidavit as Exhibit "A."

3.    On February 4, 2000, Street Systems' predecessor in interest, Street Information

Systems, Inc. ("SIS"), filed a complaint pursuant to 42 U.S.C. §1983 seeking a declaratory judgment and permanent injunction against the enforceability of the City's 1997 sign ordinance. Prior to filing the complaint, on September 1, 1999, I wrote to Joseph Gallegos, the City Manager of the City of Wilton Manors, notifying the City of SIS's claims of the patent unconstitutionality of the City's sign ordinance. A copy of my letter of September 1, 1999 is attached to this Affidavit as Exhibit "B." My letter requested an opportunity to meet with the City Attorney to discuss the matter and asked that any further action relative to SIS's July 6, 1999 applications for building permits be held in abeyance pending a meeting. Alternatively, I asked that my letter be considered a request for a review of the City's August 10, 1999 decision rejecting SIS's applications.

4.    The City responded by letter of October 1, 1999 from its City Attorney, Kerry Ezrol. A copy of Mr. Ezrol's letter is attached to this Affidavit as Exhibit "C." Mr. Ezrol's letter stated that it was the City's desire to resolve the matter amicably and asked for further information as to the specific provisions of the City's sign ordinance which SIS deemed to be unconstitutional.

5.    In response to Mr. Ezrol's letter of October 1, 1999, on November 23, 1999, I forwarded an opinion letter of SIS's co-counsel, Myron D. Cohen, dated November 22, 1999, and an accompanying memorandum of law. These documents are attached to this Affidavit as Exhibit "D." On December 29, 1999, I wrote again to Mr. Ezrol and forwarded a subsequent opinion letter of Mr. Cohen dated December 22, 1999. My letter of December 29, 1999 and Mr. Cohen's subsequent opinion letter are attached to this Affidavit as Exhibit "E." Mr. Cohen's opinion letters and memorandum of law explain in detail the constitutional defects in the City's 1997 sign ordinance.

6.    The City responded to SIS's challenge to the constitutionality of its 1997 sign

2

ordinance by amending the ordinance in its entirety, essentially conceding the constitutional infirmities which SIS had pointed out. Attached to this Affidavit as Exhibit "F" is a copy of the minutes of a City Council meeting of January 25, 2000, reflecting that Mr. Ezrol had "contacted the Florida League of Cities and they have agreed to review our existing ordinance as amended and the correspondence that we have been receiving from a New York law firm regarding a possible constitutional challenge."

7.    On January 25, and February 8, 2000, the City's amendatory sign ordinance No. Z-212 had its first and second readings and was enacted by the City. A copy of Ordinance No. Z-212 is attached to this Affidavit as Exhibit "G."

8.    Further Affiant sayeth not.


                                            GARY R. RUTLEDGE


Sworn to and subscribed before me this 24 day of August, 2000, by GARY R. RUTLEDGE, who is personally known to me ⟋ or produced the following identification _____.


                                            NOTARY PUBLIC STATE OF FLORIDA

                                            My commission expires:


Kimberly N. Boyd
MY COMMISSION # CC672013 EXPIRES
August 30, 2001
BONDED THRU TROY FAIN INSURANCE, INC.

3

(b) *Drainage and maintenance.* Off-street loading facilities shall be drained to prevent damage to abutting property and/or public streets and alleys and surfaced with erosion-resistant material in accordance with applicable city specifications. Off-street loading areas shall be maintained in a clean, orderly and dust-free condition at the expense of the owner, or lessee and not used for the sale, repair, dismantling or servicing of any vehicles equipment, materials or supplies.

(c) *Entrances and exits.* Location and design of entrances and exits shall be in accordance with all applicable traffic regulations and standards. Where the entrance or exit of a building is designed for truck loading and unloading, such entrance or exit shall be designed to provide at least one off-street loading space.

## ARTICLE 11. SIGN REGULATIONS*

### Sec. 11-1. Purpose.

The purpose of this article is as follows:

A. To permit signs that will not, by their size, location, construction or manner of display, endanger the health, safety and general welfare of the public.

B. To encourage signs that are architecturally compatible with the buildings upon which they are placed.

C. To facilitate and efficiently transfer information.

(Ord. No. Z-199, § 2, 5-27-97)

### Sec. 11-2. Definitions and interpretation.

Words and phrases used in this ordinance [article] shall have the meanings set forth in this section. Words and phrases not defined in this section but defined in section 3-2 of the Zoning Ordinance of the City of Wilton Manors [this appendix] shall be given the meanings set forth in

*Editor's note—Section 1 of Ord. No. Z-199, adopted May 27, 1997, repealed Art. 11 in its entirety. Formerly, Art. 11 consisted of §§ 11-1 and 11-2, which pertained to signs and derived from the original zoning ordinance, as amended. Section 2 of Ord. No. Z-199 enacted a new Art. 11 to read as set forth herein.

such ordinance. All other words and phrases shall be given their common ordinary meaning, unless the context clearly requires otherwise. Section headings or captions are for reference purposes only and shall not be used in the interpretation of this ordinance [article].

(1) *Animated sign:* Any sign that uses movement or change of lighting to depict action or create a special effect or scene.

(2) *Banner:* Any sign of fabric or similar material that is mounted to a pole, a wire or a building at one or more edges or covers an existing sign. A banner which is erected in a window area shall be considered a window sign. A banner which is erected inside a building doorway, garage door opening or other opening shall be considered a banner sign. National flags, state or municipal flags, or the official flag of any institution or business shall not be considered banners.

(3) *Beacons:* Any light with one or more beams directed into the sky or directed at one or more points not on the same zone lot as the light source; also any light with one or more beams that rotate or move.

(4) *Building identification marker:* Any sign indicating the name of a building and date and incidental information about its construction, which sign is cut into a masonry surface or made of bronze or other permanent material.

(5) *Building sign:* Any sign attached to any part of a building as contrasted to a free-standing sign.

(6) *Canopy sign:* Any sign that is part of or attached to an awning, canopy or other fabric, plastic or structural protective cover over a door, entrance, window or outdoor service area. A marquee shall not be considered a canopy.

(7) *Changeable copy sign:* A sign or portion thereof with characters, letters or illustrations that can be changed or rearranged without altering the face or the surface of the sign. A sign on which the message changes more than eight (8) times per day



EXHIBIT

A

shall be considered an animated sign and not a changeable copy sign for the purpose of this section. A sign on which the only copy that changes is an electronic or mechanical indication of time and/or temperature shall be considered a "time and temperature" portion of a sign and not a changeable copy sign for purposes of this section.

(8) *Commercial message:* Any sign wording, logo or other representation that directly or indirectly names, advertises or calls attention to a business, product, service or other commercial activity.

(9) *Director:* The community services director of the City of Wilton Manors or his/her designee.

(10) *Flag:* Any fabric, banner or bunting containing distinctive colors, patterns or symbols, used as a symbol of a government, political subdivision or other entity. The display and use of the flag of the United States of America by civilians or civilian groups or organizations shall comply with 36 United States Code, Section 171 et. seq., as amended.

(11) *Freestanding sign:* Any sign supported by structures supports that are placed on or anchored in the ground and that are independent from any building or structure.

(12) *Incidental sign:* A sign, generally informational, that has a purpose secondary to the use of zone lot or which it is located, such as "No Parking," "Entrance," "Exit," "Loading Zone," "Telephone" and other similar directives. No sign with a commercial message legible from a position off the zone lot on which the sign is located shall be considered incidental.

(13) *Lot:* Any piece or parcel of land or a portion of a subdivision, the boundaries of which have been established by some legal instrument of record, that is recognized and intended as a unit for the purpose of transfer of ownership.

(14) *Marquee:* Any permanent roof-like structure projecting beyond a building or extending along and projecting beyond the wall of the building, generally designed and constructed to provide protection from the weather.

(15) *Marquee sign:* Any sign attached to, in any manner, or made a part of a marquee.

(16) *Non-conforming sign:* Any sign that does not conform to the requirements of this code.

(17) *Pennant:* Any plastic, fabric or other material whether or not containing a message of any kind, suspended from a rope, wire or string, usually in series, designed to move in the wind.

(18) *Person:* Any entity, individual, association, company, corporation, firm, organization or partnership, singular or plural, of any kind.

(19) *Portable sign:* Any sign not permanently attached to the ground or other permanent structure, or a sign designed to be transported, including, but not limited to, signs designated to be transported by means of wheels; signs known as "A" frames or "T" frames; menu and sandwich board signs; balloons used as signs; umbrellas used for advertising; and signs attached to or painted on vehicles parked and visible from the public right-of-way, unless said vehicle is used in the normal day-to-day operations of the business.

(20) *Principal building:* The building in which is conducted the principal use of the zone lot on which it is located. Zone lots with multiple principal uses may have multiple principal buildings, but storage buildings, garages and other clearly accessory uses shall not be considered principal buildings.

(21) *Projecting sign:* Any sign affixed to a building or wall in such a manner that its leading edge extends more than twelve (12) inches beyond the surface of such building or wall.

(22) *Residential real estate sign:* A temporary, non-illuminated sign, advertising residential real property for sale or lease.

0000269

(23) *Roof sign:* A sign which is fastened to and supported by or on the roof of a building or which extends over the roof of a building or a projecting sign which extends more than thirty-six (36) inches over or above the roof line or parapet wall of a building.

(24) *Roof sign integral:* Any sign erected or constructed as an integral part of a normal roof structure of any design, such that no part of the sign extends vertically above the highest portion of the roof and such that no portion of the sign is separated from the rest of the roof by a space of more than six (6) inches.

(25) *Setback:* The distance from the property line to the nearest part of the applicable building, structure or sign measured perpendicularly to the property line.

(26) *Sign:* Any device, fixture, placard or structure that uses any color, form, graphic, illumination, symbol or writing to advertise, announce the purpose of or identify the purpose of a person or entity or to communicate information of any kind to the public.

(27) *Street:* A strip of land or way, subject to vehicular traffic (as well as pedestrian traffic) that provides direct or indirect access to property, including but not limited to alleys, avenues, boulevards, courts, drives, highways, lanes, places, roads, terraces, trails or other thoroughfares.

(28) *Street frontage:* The distance for which a lot line of a zone lot adjoins a public street, from one lot line intersecting said street to the furthest distant lot line intersecting the same street.

(29) *Suspended sign:* A sign that is suspended from the underside of a horizontal plane surface and is supported by such surface.

(30) *Temporary sign:* Any sign that is used only for a limited period of time and is not permanently mounted.

(31) *Wall sign:* Any sign attached parallel to, but within twelve (12) inches of, a wall, painted on the wall surface of, or erected and confined within the limits of an outside wall of any building or structure, which is supported by such wall or building, and which displays only one sign surface.

(32) *Window sign:* Any sign, picture, symbol or combination thereof, designed to communicate information about an activity, business, commodity, event, sale or service, that is placed inside a window or upon the window panes or glass and is visible from the exterior of the window.

(33) *Vehicle sign:* A sign attached to or placed on a vehicle, including automobiles, trucks, boats, campers, and trailers which vehicle is parked on or otherwise utilizing a public or private right-of-way, public property or private property so as to be intended to be viewed from a vehicular right-of-way for the basic purpose of providing advertisement of products or services or directing people to a business or activity. This definition is not to be construed to include those signs or such advertising devices as may be attached to and within the normal unaltered lines of the vehicle of a licensed transit carrier that identify a firm or its principal products on a vehicle, of but only during the time said vehicle is regularly and customarily traversing the public highways during the normal course of business.

(34) *Zone lot:* A parcel of land in single ownership that is of sufficient size to meet minimum zoning requirements for area, coverage, and use, and that can provide such yards and other open spaces as required by the zoning regulations.

(Ord. No. Z-199, § 2, 5-27-97)

## Sec. 11-3. General sign regulations.

A. *Permit required.* Except as provided in this article, no sign, whether permanent or temporary, shall be erected, constructed, posted, painted, altered, maintained, or relocated until a permit has been issued by the building official. Before any permit is issued, an application, provided by the building department, shall be filed together

0000270

with such drawings and specifications as may be necessary to fully advise the city with the location, construction, materials, manner of illuminating, method of securing or fastening the number of signs applied for and the wording of the sign. All signs which are electrically illuminated by neon or other means shall require a separate electrical permit and inspection.

B. *Code requirements.* Structural and safety features and electrical systems shall be in accordance with the requirements of the South Florida Building Code, Broward County Edition. No sign shall be approved for use unless it has been inspected and found to be in compliance with all requirements of this article and all applicable codes and ordinances.

C. *Exempt signs.* The following signs may be erected or constructed without a permit; however, such construction must be in accordance with the South Florida Building Code, Broward County edition:

1. Official traffic signs or sign structures, or governmental information signs and provisional warning signs or sign structures, when erected or required to be erected by a governmental agency, and temporary signs indicating danger.

2. Historical markers approved by the city council.

3. Signs directing and guiding traffic on private property, providing the sign area is two (2) square feet or less.

4. Changing of the copy on a bulletin board, poster board, display encasement or marquee.

5. The identification of a firm or its products on a stationary vehicle is permitted subject to the vehicle meeting the following conditions:

   a. The vehicle is not within twenty-five (25) feet of the front property line or fifteen (15) feet of a side property line facing a street. The vehicle shall be parked on private property which is paved.

   b. The vehicle is not stationary for more than two (2) continuous hours during the normal working day.

   c. The vehicle is roadworthy, licensed and consistent with all state mandated motor vehicle statutes.

   d. The signs are permanently attached to the vehicle.

   e. No sign attached to a vehicle may be illuminated when said vehicle is parked.

D. *Pole signs (detached, pylon and/or freestanding).*

1. Existing pole signs: Signs which do not conform with the regulations listed below (subsection D.4) shall be removed within ten (10) years of the date of adoption of this ordinance [article].

2. Repair of pole sign: The value of the repair of non-conforming pole signs shall not exceed twenty-five (25) per cent of the replacement cost of the sign as determined by the building official. No more than one building permit shall be issued for the repair of a pole sign within a three (3) year period. Change of copy shall not be considered a repair, but the pole sign must either conform with this ordinance [article] or be removed pursuant to subsection D.

3. Pole signs associated with uses that primarily sell gasoline are listed in division [section] 11-6.A.

4. Pole sign regulations: New and existing pole signs shall conform with the following regulations:

0000271

APPENDIX A—ZONING

## SCHEDULE 1
## POLE SIGN REGULATIONS

| Use | Location Criteria | Max. Sign Area (sq. ft.) | Max. Number Per Site | Max. Height | Setback | Special Conditions |
|---|---|---|---|---|---|---|
| Retail Shopping Center Office Apt. Bldg. Hotel/Motel Restaurant<br><br>Community Facility<br>Government Uses | Meet any one of the below site criteria:<br><br>1. 300 ft. of frontage on 1 street<br><br>2. Occupies 50% or more of the block<br><br>3. If the wall of the bldg., on which a flat sign would be placed, cannot be seen by a vehicle 150 ft. from said wall. Line of site survey required to verify this criteria. | 128 sq. ft. aggregate<br><br>64 sq. ft. 1 side | 1 per street frontage regardless of the number of uses on site | 16 ft. to top of sign.<br><br>If in corner line of site then 8 ft. clear ht. 14 ft. clear ht. if over a parking space or traffic lane. | 7 ft. to leading edge of sign. | Outparcels: see Monument Regulations in Schedule 2<br><br>Copy limited to name of Use and address |

5.  Monument sign regulations:

## SCHEDULE 2
## MONUMENT SIGN REGULATIONS

| Use | Maximum Sign Area | Maximum Number Per Site | Setback | Maximum Height | Special Conditions |
|---|---|---|---|---|---|
| Apt. Bldg., Hospital Hotel/Motel, Industrial Manufacturing, Office Projects, Outparcels in Retail Uses, Restaurant, Shopping Center, Government Uses<br><br>Any other similar use when approved by the Community Services Director | St. Frontage/Max Area:<br><br>Less than 100 ft. of frontage not permitted.<br><br>100<200 ft./24 sq. ft.°<br>200<300 ft./36 sq. ft.°<br><br>Each side of monument.<br><br>Above area is for single sided signs for double faced signs double the area of single faced sign.<br><br>Monument signs shall be perpendicular or angular to street rather than parallel to street. | 1 per street frontage regardless of the number of uses on site | 7 ft. to leading edge of sign | 6 ft. no landscaping<br><br>8 ft. with landscaping | Box signs not permitted.<br><br>Area around sign to be illuminated for safety.<br><br>Copy limited to name of Use and address. |

0000272

E. *Signs located on the underside of awnings or canopies.* Signs, not exceeding four (4) square feet in area with letters not exceeding six (6) inches in height, hanging from the underside of an awning or canopy with a minimum height clearance of 7 ft. 6 in. However, signs that are painted, stamped, perforated or stitched on the surface area of an awning, canopy or roller curtain are permitted only in commercial districts; the square footage of such signs shall not exceed twenty-five (25) per cent of the length of the awning or canopy and letters shall not exceed a height of twelve (12) inches. Signs permitted under this subsection E are counted towards the maximum number of signs that are permitted on the site.

F. *Window signs.* In addition to other permitted signs, one sign is permitted on one window or door with copy limited to the name of the commercial use and/or hours of operation with a maximum letter size of six (6) inches. The maximum area of the sign shall not exceed ten (10) per cent of the window area; however, when there are no other signs associated with the use, the main permitted sign may be located on the window with a size not to exceed twenty (20) square feet. Size limitations are for any sign located within ten (10) feet of the window. "Open" and "Close" signs are permitted if they are non-illuminated and less than one square foot. Temporary signs placed in the windows of a commercial establishment shall not exceed ten (10) per cent of the window area.

G. *Colored fluorescent (neon) tubing or banding.* The community services director may approve the use of banding or tubing on a building subject to the following conditions:

1. It is more than one hundred (100) feet from a residential use.

2. It is not used to border a window or any portion thereof.

3. One band with up to three (3) colors per building.

4. It is used to emphasize architectural features of a building.

5. See division [subsection] F. above for window signs.

Applications which are not consistent with the above conditions may be considered by the board of adjustment as an appeal of an administrative decision.

H. *Setback requirements.*

1. Unless otherwise specified in this article, all signs shall comply with the yard requirements of the zoning district in which they are located.

2. No sign, portable or otherwise, is to be placed or located to conflict with the corner visibility requirements of section 8-1 of the Zoning Ordinance of the City of Wilton Manors.

3. Detached (pole/pylon, monument) signs. The setback is measured from the portion of the sign that is located closest to a lot line.

I. *Legal non-conforming uses.*

1. Permitted signs for a legal non-conforming use in a residential district shall consist of those signs permitted in the ROSC zoning district.

2. Except as otherwise specifically provided in this section, all signs shall be subject to the provisions of article 13 of the Zoning Ordinance of the City of Wilton Manors, "Non-conforming Structures and Uses."

J. *Removal required.*

1. All signs shall be maintained in good condition and appearance. Any persons responsible for the erection or maintenance of a sign which fails to comply with this article shall be subject to enforcement procedures as set forth in this article. Supporting structures for non-conforming signs shall also be removed when the sign is removed unless said structure is supporting additional signage.

2. Any sign previously associated with a vacated premises shall be removed from the premises by the owner or lessee within thirty (30) days of the date the activity

ceases to exist. In the case of non-conforming signs, supporting structures shall also be removed.

3. The community services director or his designee may initiate proceedings that result in the removal of any sign erected or maintained without a permit.

4. In any zoning district where a sign does not comply with the provisions of this article and has not received a building permit, such sign and any supporting structures other than a building shall be removed unless a building permit is issued in compliance with this ordinance [article]. Supporting structures for non-conformance signs shall be removed when the sign is removed.

5. A non-conforming sign, which is damaged by any cause, such that the cost of repairing the sign equals fifty (50) per cent or more of the original value of the sign, shall be removed.

K. *[Illuminated signs.]* All lights and lighting from a sign shall be designed and arranged so as not to cause direct glare onto another property, [or into] the eyes of passing motorists or pedestrians. Signs may only be illuminated by one of the following methods:

1. By lights placed inside individual pan-channel letters with a translucent face;

2. By "halo" lights placed behind individual reverse pan-channel letters; or

3. By lights which are directed to shine directly on the sign.

L. *[Replacement signage.]* Should signage be removed due to a road widening, all replacement signage shall be in conformance with this article.

M. *[Signs in rights-of-way.]* Signs placed in dedicated rights-of-way shall only be permitted upon the owner recording in the circuit court a covenant running with the land that states the owner will remove the sign at his cost should the right-of-way be needed for traffic improvements.

N. Any pole sign that is not consistent with division [subsection] 11-3.D.

O. *[Box signs.]* Box signs are only permitted if the sign is constructed as an integral part of the architectural design of the building in locations that were designed for a box sign. Appeal of this decision is to the board of adjustment. Change of copy on existing signs is permitted. Repair of sign is permitted if the cost of the repair is fifty (50) per cent or less than the original value of the sign.

P. *[Limitations on copy.]* Copy is limited to the name of the premises or use(s) of the property and generic words or symbols which describe products or services.

Q. *Credit card signs, telephone numbers, addresses and lottery signage:*

1. Only one sign per credit card accepted per place of business may be installed. Installation is to be flush on the window or door.

2. Telephone numbers are permitted as part of a single window sign. Lettering size is not to exceed six (6) inches in height. Telephone numbers are prohibited on the building facade or awning.

3. Lottery, lotto or other state regulated game signs are limited to one official decal not to exceed twenty (20) square inches in size, installed flush on the window or door. All other lottery signs or posters are prohibited within sight from a public or private roadway and/or sidewalk.

4. Building address numbers should be permitted in only one location on the facade, awning or window. The street name totally spelled out should not be permitted on the facade, awning or windows.

(Ord. No. Z-199, § 2, 5-27-97)

### Sec. 11-4. Prohibited signs and sign devices.

A. No sign shall be constructed, erected, used, operated, or maintained so as to display intermittent lights, to move or revolve.

B. No sign shall be constructed, erected, used, operated or maintained which uses the word "Stop" or "Danger" or similar word that presents or implies the need or requirement for stopping, or the existence of danger, or which is a copy or imitation of an official sign. This provision regard-

ing the words "Stop" and "Danger" does not apply when the words are a part of attraction titles for a broadcast motion picture, theater event, opera or concert, or when they are used in descriptive lines of advertising, so long as they are not used to imply any official traffic warning, either for vehicles or for pedestrians.

C. No sign shall be constructed, erected, used, operated or maintained so as to provide a background of colored lights blending with the traffic signals to the extent of confusing a motorist when viewed from a normal approaching position of a vehicle at a distance of twenty-five (25) to three hundred (300) feet.

D. No sign shall be attached or otherwise applied to trees, utility poles, bus benches, trash receptacles, or any other unapproved supporting structures, except as approved by the city or county commission.

E. No sign shall have spinning devices, or strings of spinning devices, or other similar devices.

F. Signs which are not securely affixed to the ground, or otherwise affixed in a permanent manner to an approved supporting structure, shall be prohibited.

G. The following signs are also prohibited:

1. Animated signs or signs designed for changeable copy; the latter is permitted for theaters and institutional uses.

2. Billboards.

3. Rooftop signs.

4. Off-premises sign.

5. Swinging sign.

6. Snipe signs.

7. Movable, rotating signs.

8. Sandwich or sidewalk signs, except as provided for in section 11-5F.

9. Banners, buntings, pennants and streamers, except as permitted by section 11-5B, Schedule 3, #5 and as allowed by the city council.

10. Flashing signs, running lights or electronic message boards.

11. Bare bulb signs.

12. Abandoned signs.

13. Signs which emit audible sounds, odors, or visible matter are prohibited.

14. Box signs, except for those approved under section 11-3.0.

15. Any sign which is of such intensity or brilliance as to cause glare or impair the vision of the driver of any motor vehicle.

16. New pole signs are prohibited unless they are consistent with the regulations listed in section 11-3.D and section 11-6. Pole signs which are inconsistent are considered as non-conforming structures and must be removed according to the procedures set forth in section 11-7.

17. Signs attached to trees or other vegetative landscaping material.

18. Signs having changeable copy, except signs for institutional uses.

H. Signs over public property.

1. No portion of any sign which extends over a public sidewalk or alley shall be less than seven and one-half (7.5) feet above such sidewalk or greater than fourteen (14) feet above such sidewalk or alley, measured vertically directly beneath the sign to grade, except for marquis signs which may extend above the sidewalk to within eighteen (18) inches of the curb.

2. When a sign is found to be located on public property and without a building permit, the city shall have the right to remove said sign. The owner may recover the sign by paying the removal costs within sixty (60) days of the removal. If the sign is not recovered by the owner within sixty (60) days, then it shall be considered abandoned as permitted by law. The city shall recover all costs in conjunction with said removal of signs from the owner or the owner's property. Said recovery may be by way of personal action against the

owner or a lien may be placed against any property of the owner located within the city.

(Ord. No. Z-199, § 2, 5-27-97)

### Sec. 11-5. Temporary signs.

Temporary signs may be erected and maintained in accordance with the provisions of Schedule 3 contained in section 11-5.

A. *General provisions.*

1. Permit required. No person shall erect, construct, repair, alter or relocate any temporary sign, other than in the window of a commercial establishment, without first obtaining a permit from the building department unless otherwise stated in these regulations.

2. Illumination. Temporary signs shall not be illuminated except for temporary construction signs.

3. Copy shall be limited to the uses permitted in the zoning district in which the property is located.

4. No more than one temporary sign shall be permitted on each window.

5. Temporary signs shall be prohibited on doors.

6. All temporary signs which pertain to a time, event or purpose which is no longer imminent or pending shall be immediately removed.

0000276

§ 11-5                                WILTON MANORS CODE

B.  *Schedule 3, Schedule of Requirements for Temporary Signs.*

## SCHEDULE 3
## REQUIREMENTS FOR TEMPORARY SIGNS

| | Category | Number | Sign Area | Time Period | Special Conditions |
|---|---|---|---|---|---|
| 1. | Business Signs identifying a particular activity, service, product or sale of limited duration. | Maximum of two permits for the same Premises within one calendar year. | Non-conforming business in a residential district: 4 sq. ft. Non-residential: 15 sq. ft. | Temporary business Signs shall be erected and maintained for a period not to exceed 30 days. | Temporary business Signs shall be located only upon the Lot in which the special Use, activity, service, product or sale is to occur. |
| 2. | Construction Signs: located on the construction Site identifying the parties involved in the construction and financing. Apartment Buildings may have a Sign with the name of the project and unit types. Commercial Building may have copy indicating the name of the project and tenants. Artistic murals ornamental Signs are permitted. Sign copy with prices is prohibited. | There shall be a maximum of one Sign per Street frontage. Maximum height shall be 14 feet. With the exception of construction signs located at single-family dwellings, a bond shall be posted to provide for the removal of temporary construction signs. | Single-family: 8 sq. ft. All other Districts: 1 sq. ft. per linear foot of Street frontage not to exceed 50 sq. ft. However, the area contained in renderings, decorative or artistic signs is not included in the Sign area calculation. | Temporary Construction Signs may be erected and maintained for a period beginning with the issuance of a Building Permit for the temporary sign and removed prior to the issuance of a Certificate of Occupancy. | The amount of the bond shall be set at $200. All Signs having letters and numbers shall be reviewed and if appropriate approved by the Community Services Director, or his designee. Those signs decorative or artistic designs shall be reviewed by the Design Review Board. |
| 3. | Real Estate Signs/Single-Family Residential: Advertising the sale, lease or rent of the Premises upon which such Sign is located. Sign copy with prices is prohibited. | There shall be a maximum of one Sign permitted per property except for waterfront property where a second sign is permitted facing the water. Max. of three Strip Signs to be attached directly below primary sign and the "Open House" type sign is allowed only while the owner or agent is on the premises. Sign may be double faced provided information is identical. | Primary Sign shall be 4 sq. ft.; Strip Sign 6 inches by 30 inches maximum; "Open House" type Sign 22 inches by 16 inches. | Temporary Real Estate Signs shall be removed within seven days of the sale or lease of the Premises upon which the Sign is located | Detached Signs shall have a setback of 10 feet if Lot is vacant, 3 feet if Lot has improvements. Sign may be placed on structure or wall if structure or wall is less than 3 feet from property line. Height shall not exceed five (5) feet. Only the following information and no other information may appear on the Sign: (1) "For Sale", "For Lease", or "For Rent", or combination thereof. (2) The name of the Real Estate Broker or Realtor as registered with the Florida Real Estate Commission, the name of the owner or the words "By Owner". (3) A designation following such name as being either a Realtor, Broker, or Owner in lettering not exceed 4 in. in ht. (4) The telephone number of said Realtor, Broker or Owner. (5) The words by Appointment Only; Waterfront Pool. Iridescent & Illuminated signs are prohibited. No signs are permitted on public property. |

0060277

**SCHEDULE 3**
**REQUIREMENTS FOR TEMPORARY SIGNS (Cont'd.)**

| | Category | Number | Sign Area | Time Period | Special Conditions |
|---|---|---|---|---|---|
| 4. | Real Estate Signs/Multi-Family, Commercial, Industrial, Vacant Land (other than residential): Advertising the sale, lease or rent of the Premises upon which such Sign is located. Sign copy with prices is prohibited. | Number shall be a maximum of one sign permitted per street frontage. | Multifamily not to exceed 2 feet by 3 feet; Commercial/Industrial not to exceed 3 feet by 4 feet; Vacant Land (except residential) not to exceed 4 feet by 6 feet. | Temporary Real Estate Signs shall be removed within seven days of the sale or lease of the Premises upon which the Sign is located. | Real Estate Sign on windows of Apartment in Multi-family Buildings or individual offices - 2 sq. ft.<br><br>Detached Signs shall have a setback of 10 feet if Lot is vacant, 3 ft if Lot has improvements. Sign may be placed on structure or wall if structure or wall is less than 3 feet from property line. Height shall not exceed seven.<br><br>Only the information permitted on Residential Real Estate Signs plus the following information may appear:<br><br>(1) Zoning information<br><br>(2) Size of property and/or Building.<br><br>(3) Permitted Use of Property. |
| 5. | Banners and balloon Signs: Hot or cold air balloons or other gas filled figures or similar type Signs. | Maximum of one beacon, banner or balloon Sign per structure. | N/A | See number C. below. | Temporary signs may be erected, only on a temporary permit basis as approved by the Community Services Director with a Bldg. Permit. A performance bond in an amount necessary in order to insure its removal, but not less than $500 is required. Maximum height is 35 ft.; 1500 ft. from another balloon sign; area not to exceed 250 sq. ft. See number C for additional regulations. |

C. *Temporary political signs.*

   1. Scope. Nothing in this section shall be deemed to regulate the erection and maintenance of permanent political signs.

   2. Structural requirements.

      a. Maximum area per sign: Thirty-two (32) square feet.

      b. Maximum height per sign: Fifteen (15) feet.

      c. Total area of all signs on one property: One square foot per foot of street frontage, not to exceed one hundred (100) square feet per property.

   d. Maintenance: All temporary political signs shall be constantly maintained in a state of security, safety and good repair.

3. Removal.

   a. The community services director shall order the removal of any temporary political sign not erected or maintained in accordance with this article by giving written notice to the owner or lessee of the property and the person or organization erecting the sign, if the same be known, together with a state-

0000278

§ 11-5                                    WILTON MANORS CODE

ment of the reasons that the sign is in violation of this article.

b.  If no response is made to the notice of violation within seventy-two (72) hours of its receipt, or within seventy-two (72) hours of posting the notice of violation on the property, if personal service of the notice cannot be made, the community services director shall cause the sign to be removed.

c.  As a prerequisite to the posting or displaying of said signs, the said candidate shall file with the city clerk of the City of Wilton Manors a cash bond in an amount to be established by resolution of the city council, as may be amended, to secure the removal of said signs within fifteen (15) days after termination of said election, whether the same be a special or general election.

If any signs posted or exhibited in compliance with this article shall so remain posted or exhibited fifteen (15) days after termination of the general or special election, the cash bond hereinabove required shall be forfeited to the City of Wilton Manors to pay for the cost of removal of said sign by the city. Should all signs posted or exhibited pursuant to this article be removed within the aforesaid fifteen-day period, then, in that event, the cash bond posted with the city clerk shall be returned to the said candidate by mailing the same to the address provided by the candidate at such time as he or she deposited the bond with the city.

Each candidate shall personally be responsible for the filing

of the bond required in this article, whether the signs displayed in his behalf are personally posted by said candidate or someone in said candidate's behalf.

4.  Reserved.

5.  Forms to be provided by the community services director, penalty.

a.  All forms required by this article shall be provided by the community services director at no charge.

b.  Any person violating any provision of this article shall, upon conviction by a court of competent jurisdiction, be subject to a fine not to exceed five hundred dollars ($500.00), or imprisonment for a period not to exceed sixty (60) days, or by both such fine and imprisonment.

D.  *Beacons, banners and balloon signs.*

1.  Permitted in commercial and industrial manufacturing districts.

2.  Shall only be associated with grand openings and promotions.

3.  Size: Banners and balloons not to exceed two hundred fifty (250) sq. ft.

4.  Fee per application: Fifty dollars ($50.00).

5.  Maximum duration:

a.  Grand openings: Fourteen (14) consecutive days within twelve-month period.

b.  Special promotions: Seven (7) consecutive days, twice within twelve-month period.

E.  *Decoration and festoons of lights.*

1.  Limited to sixty (60) days, either consecutively or separably within a twelve-month period.

2.  Limited to recognized holidays. Signs, which are associated with the holiday decorations and festoons, shall

0000279

directly relate to the symbols, graphics and colors that are commonly associated with the holiday.

F.   *[Sandwich or sidewalk signs.]* Menu stand sandwich or sidewalk signs are only permitted on the sidewalk in the Arts and Entertainment Overlay District upon the approval by the community services director, whose decision shall be based upon the following design criteria. Appeal of their [his/her] decision is to the board of adjustment pursuant to the procedures set forth in this ordinance [article].

1.   Minimum sidewalk width: Five (5) ft. of clear passageway free of signage tables and chairs must be maintained.

2.   Permitted uses: Restaurant.

3.   Maximum number signs: One per site.

4.   Maximum area: Four (4) square feet per side.

5.   Maximum height: Five (5) feet above sidewalk.

6.   Location: Store entryway or immediately adjacent to the front of the business.

7.   All such signs shall be removed at the end of each business day and stored indoors.

8.   These signs shall be limited to the name of a restaurant or retail art related sales, current list and prices of foods, food preparations or products available in that restaurant or retail art businesses.

9.   Sign letters shall not exceed six (6) inches in height.

10.  The vertical angle of a freestanding sign shall not exceed thirty (30) degrees.

11.  Design criteria: Signs should be artistic in nature; use graphics, symbols or illustrations; designed to show the product or service being offered;

materials and design should result in a light, tropical and artistic appearance.

(Ord. No. Z-199, § 2, 5-27-97; Ord. No. Z-205, §§ 1, 2, 2-10-98)

## Sec. 11-5.1. Sign regulations per zoning district.

A.   *General provisions.*

1.   Accessory signs shall have copy limited to the uses permitted in the zoning district in which the property is located.

2.   Aggregate sign area shall include the principal and accessory signs.

3.   All signs shall front on a street or waterfront unless as set forth in division [subsection] 11-5.A.4 below.

4.   Signs fronting on an alley are prohibited unless the alley abuts or is adjacent to a parking lot or garage, or where the alley provides a means of entrance to a business, the areas of the sign shall be the same as if the sign fronted on a street.

5.   Logos, trademarks, insignias and similar emblems shall be considered as signs.

6.   Community services director shall approve the following signs if consistent with the following criteria:

a.   Signs on public right-of-way (requires public services superintendent approval) for places of worship, public institutions and points of interest. Each name or insignia not to exceed one sq. ft. If there are multiple signs, the sign area is not to exceed twenty-four (24) sq. ft.

b.   Signs on private property relating to the name of a neighborhood, neighborhood civic association that is recognized by the city clerk as representing a neighborhood in the city or subdivision; maximum size of ten (10) sq. ft. per street frontage.

7.   Paper or metal signs attached to a wall or fence limited to one sq. ft. and two (2) per

0000280

property having copy such as but not limited to "No Trespassing" or "Beware of Dog."

8. Nothing in this article shall limit the posting of signs by a governmental agency with copy relating to legal notices, warnings, traffic or safety.

B. *Schedule 4, Schedule of Sign Regulations.*

APPENDIX A—ZONING

§ 11-5.1

## SCHEDULE 4
## PRINCIPAL USE OF SIGNS

| | Zoning District | Number | Awning/Marquee | Flat | Projecting | Detached Pole/Pylon or Monument | Accessory Signs | Special Conditions |
|---|---|---|---|---|---|---|---|---|
| 1. | Single-family and duplex districts and uses.<br><br>HS6-RD12 PUD (if single-family) PD (if single-family) | One sign per street frontage that has copy limited to the name of the building. | Not Permitted | Residential Use: 6 in. letters | Not permitted | Not permitted | Not permitted | None |
| 2. | Multiple-family, apts and hotels in these districts:<br><br>RM12 RM16 RM20 Community facility PUD or PD (if multifamily) | No more than one sign identifying the main permitted uses for each street frontage. Unless otherwise listed in Section A above, all signs must front on a street. | 16 sq. ft. | One per street frontage; 30 sq. ft. max. | 16 sq. ft. | Max. area 15 sq. ft. not to exceed 4 ft. above grade. | One sign for no more than two Accessory Uses. Area of each sign shall not exceed 1 sq. ft. per linear foot of frontage not to exceed 20 square feet. | The height of letters shall not exceed 1 ft. on a marquee or awning sign; max. size for schools is 30 sq. ft. Signs shall not have copy indicating prices. |
| 3. | ROSC ROSCH | One sign per street frontage identifying the use and one sign limited to name of building | Not permitted. | Nine inch letters 9 sq. ft. area | Not permitted | Monument 3 ft. ht. above grade area 9 sq. ft. | Window or door hours of operation open/closed | Approval by P&Z Board |
| 4. | Commercial Districts:<br>B-1 B-2 B-3 PUD PUD | One sign per street frontage for each principal and accessory use permitted. | Awning: See 8.2.E Marquee: 176 sq. ft. only allowed in Commercial Districts | See 7, below | 16 sq. ft. | Not permitted except as allowed in 8.2D. Filling stations see 8.8A. When permitted, See 8.2D | One for each accessory use, area of each sign shall not exceed 1 sq. ft. per linear foot of frontage not to exceed 10 sq. ft. | Establishments with corner (facing street) locations may have signage on each side.<br><br>Signs located on parapet of multistory buildings, max. 3 ft. ltrs.; 1 sign per side of building. Signs not allowed on sides of building above 1st floor except for those on parapet. |
| 5. | Government Uses | Shall follow the sign regulations in adjacent districts as determined by the Community Services Director. | | | | | | |
| 6. | Flat Signs** | Max. Size Letters<br>24 in.<br>30 in.<br>36 in.<br>42 in. | Distance from lot line (facing street)<br>less than 100 feet<br>100 to 200 feet<br>200 ft. but less than 300 ft.<br>300 ft. or more | Sign Area<br>25 sq. ft.<br>30 sq. ft.<br>35 sq. ft.<br>45 sq. ft. | | | | |

** A curvilinear building located at the intersection of two streets may be permitted to have a sign conforming to the contour of the building in lieu of having one primary sign on the front elevation and one secondary sign on the side street elevation. When combining the primary and secondary signs into one sign, the maximum area of the sign is increased by 100% and the maximum size of the letters is increased by 25%.

(Ord. No. Z-199, § 2, 5-27-97)

0000283

APPENDIX A—ZONING

§ 11-8

### Sec. 11-6. Signs for filling stations and artistic or super graphics.

A. Signs for filling stations and any other use that sells gasoline shall be subject to the following:

### SCHEDULE 5

| | Type of Sign | Number | Sign Area | Aggregate Area | Special Conditions |
|---|---|---|---|---|---|
| 1. | Canopy signs | Total of one sign per street frontage | 40 sq. ft. max. | 80 sq. ft. max. | None |
| 2. | Flat wall signs | Total of one sign per street frontage | 40 sq. ft. max. | 80 sq. ft. max. | None |
| 3. | Detached pole/pylon signs | One fixed sign per site | 20 sq. ft. max. | 40 sq. ft. max. | Height shall not exceed 16 ft. to top of sign |
| 4. | Accessory Bldg. (car wash, food/office, etc.) | Total of one sign per street frontage | 10 sq. ft. max. | 20 sq. ft. max. | None |
| 5. | Service Bay Identification: Providing direction or instructions by containing no advertising | One sign per service bay located on premises. | 5 sq. ft. max. | 15 sq. ft. max. | The info. displayed by service by identification sign shall be in compliance with 8A-7, 10 of the City Code. |
| 6. | Service Island Identification: Indicating type of service offered, price of gasoline and other relevant information or containing no advertising material. | One sign per service island located on premises. | 5 sq. ft. max. | 10 sq. ft. max. | Information displayed by a service island identification sign shall be in compliance with 8A-7, 10 of the City Code. |
| 7. | Signs having copy indicating the sale of products. | No more than one sign per window. | | | Height of letters shall not exceed two inches. |

(Ord No. Z-199, § 2, 5-27-97)

### Sec. 11-7. Non-conforming signs.

A. Except in the following instances, no non-conforming sign shall be altered in any manner unless made to conform with all the provisions of this article.

1. If the alteration is limited exclusively to repainting or restoration of an existing sign with no increase in area and does not cost in excess of three hundred dollars ($300.00).

2. Pole signs. See [subsection] 11-3.D.

B. All non-conforming signs shall be removed prior to the issuance of a building permit for any new signage.

C. Copy may be changed on any non-conforming sign consistent with [subsection] 11-3.J.

(Ord. No. Z-199, § 2, 5-27-97)

### Sec. 11-8. Computations.

The following principles shall control the computation of sign area and sign height:

A. *Computation of area of individual signs.* The area of a sign face, which is also the sign area of a wall sign or other sign with only one face, shall be computed by means of the smallest square, circle, rectangle, triangle or combination thereof that will encompass the extreme limits of the writing, representation, emblem or other display, together with any material or color forming an integral part of the background of the display or used to differentiate the sign from the backdrop or structure against which it is placed, but not including any supporting framework, bracing, or decorative fences or wall when

0000284

such fence or wall otherwise meets zoning ordinance regulations and is clearly incidental to the display itself.

B. *Computation of area of multi-faced signs.* The sign area for a sign with more than one face shall be computed by adding together the area of all sign faces visible from any one point. When two (2) identical sign faces are placed back to back, so that both faces cannot be viewed from any point at the same time, and which such sign faces are part of the same structure and are not more than forty-two (42) inches apart, the sign area shall be computed by the measurement of one of the faces.

C. *Computation of height.* The height of a sign shall be computed as the distance from the base of the sign at normal grade to the top of the highest attached component of the sign. Normal grade shall be constructed to be the lower of (1) the newly established grade after construction, exclusive of any filling, berming, mounding or excavating solely for the purpose of locating the sign, or (2) the elevation of the nearest point of the crown of a public street.

(Ord. No. Z-199, § 2, 5-27-97)

## ARTICLE 12. LANDSCAPING REQUIREMENTS*

### Sec. 12-1. Objective.

The purpose of this article is to provide new regulations for the installation and maintenance of landscaping within the municipal limits of the City of Wilton Manors. It is recognized that landscaping is a necessary ingredient in the urban environment in that trees and shrubs are known producers of oxygen and that trees and shrubs appreciably reduce the carbon dioxide content in the air people breathe and that trees and shrubs are an invaluable physical and psychological counterpoint to the urban setting, making life more comfortable by providing shade and cooling the air and land, reducing noise and glare, and breaking the monotony of development on the land. The provisions of this article are the minimum landscape requirements of the city. Any other regulations relating to removal, replacement, or maintenance of trees which are more restrictive shall supersede these regulations to the extent of any inconsistency.

(Ord. No. Z-197, § 2, 5-27-97)

### Sec. 12-2. Perimeter landscape requirements.

Landscape buffer strips shall be required around the perimeter of all property lines, exclusive of single-family and individual duplex development. The minimum width of such buffer strips shall be as follows:

1. Abutting public right-of-way, excepting alleys: Ten (10) feet;

2. Abutting rear or side common property lines, except where a building is constructed: Five (5) feet.

These landscape strips shall be landscaped with trees, sod, ground cover or hedge material. The swale area between the property line and the street pavement shall be sodded. Most trees as specified in the "approved" listing will be permitted to be used in the perimeter strip adjacent to the street right-of-way. Trees near where accessways intersect with the street right-of-way shall be placed so that they do not obstruct the visibility of traffic. They also shall have the limbs and foliage kept trimmed to six (6) feet minimum height from the ground.

(Ord. No. Z-197, § 2, 5-27-97)

### Sec. 12-3. Off-street parking area landscape requirements.

All parking areas shall be surrounded by at least a five (5) foot wide planting area. Rows of parking spaces shall be terminated with land-

---

*Editor's note—Section 1 of Ord. No. Z-197, adopted May 27, 1997, repealed Art. 12 in its entirety. Formerly, Art. 12 consisted of §§ 12-1—12-7, which pertained to landscaping and derived from the original zoning ordinance, as amended. Section 2 of Ord. No. Z-197 enacted a new Art. 12 to read as set forth herein.

# RUTLEDGE, ECENIA, PURNELL & HOFFMAN

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

STEPHEN A. ECENIA
JOHN R. ELLIS
KENNETH A. HOFFMAN
THOMAS W. KONRAD
MICHAEL G. MAIDA
J. STEPHEN MENTON
R. DAVID PRESCOTT
HAROLD F. X. PURNELL
GARY R. RUTLEDGE

POST OFFICE BOX 551, 32302-0551
215 SOUTH MONROE STREET, SUITE 420
TALLAHASSEE, FLORIDA 32301-1841

—————

TELEPHONE (850) 681-6788
TELECOPIER (850) 681-6515

OF COUNSEL:
CHARLES F. DUDLEY

GOVERNMENTAL CONSULTANTS:
PATRICK R. MALOY
AMY J. YOUNG



September 1, 1999

Mr. Joseph Gallegos
City Manager
City of Wilton Manors
City Hall
524 N.E. 21st Court
Wilton Manors, Florida 33305

> RE:  Off-premise Sign Permit Applications for the Following:
>       Property ID Number 494228080300
>       Property ID Number 494227230010
>       Property ID Number 494227350030
>       Property ID Number 494227320180
>       Property ID Number 494227180010
>       Property ID Number 494228000032

Dear Mr. Gallegos:

This firm represents Street Information Systems, Inc., a professional sign company.  Daniel Hardin of Street Information Systems, Inc., utilizing Weatherington Builders, recently filed six applications for sign permits for locations within the City of Wilton Manors.  It is the apparent position of the City that off-premise signs are prohibited under the Wilton Manors sign code ordinance and therefore, these applications must be denied.

In a series of cases, including *National Advertising v. City of Fort Lauderdale*, 934 F.2d 283 (11th Cir. 1991), the federal court found the City of Fort Lauderdale's sign ordinance to be unconstitutional in its entirety.  The basis of the federal court's holding of unconstitutionality was that the sign ordinance impermissibly differentiated between commercial and non-commercial speech.

Like the City of Fort Lauderdale ordinance, the Wilton Manors' ordinance basically authorizes only point of sale signs with certain exceptions and suffers from the same invalidity for unconstitutionally differentiating between commercial and non-commercial speech.  The City can make no credible showing that a total ban on off-premises advertising will, to a material and

Dawn - FAX copy To Kerry

**EXHIBIT**
tabbies
B

copy To Harold H.
JE 9/3

Mr. Joseph Gallegos
September 1, 1999
Page 2

direct degree, advance the purported purpose in protecting the health, safety and general welfare of the public. See *44 Liquor Mart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S. Ct. 1495, 1507, 134, L.Ed. 2d 711 (1996), *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 113 S. Ct. 1505, 123 L.Ed. 2d 99 (1993), and *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 115 S. Ct. 1585, 1592, 31 L.Ed. 2d 532 (1995).

In light of the foregoing, we would appreciate the opportunity of meeting with you and with the City Attorney to further discuss this matter. We also request that any further action relative to these sign permit applications be held in abeyance pending such meeting or in the alternative, that this letter be considered a request for review of the City's decision.

Thank you for your attention to this matter.

Sincerely,

Gary R. Rutledge

# City of Wilton Manors

524 Northeast 21st Court • Wilton Manors, Florida 33305 • (954) 390-2100 • FAX (954) 390-2199

**EXHIBIT**

C

**Jack Seiler**
*Mayor*

**John R. Fiore**
*Vice Mayor*

**Joanne Fanizza**
*Councilmember*

**Richard Pratt**
*Councilmember*

**Gary Resnick**
*Councilmember*

**Joseph L. Gallegos**
*City Manager*

**Kerry Ezrol**
*City Attorney*

October 1, 1999

<u>**VIA FACSIMILE (850) 681-6515**</u>

Gary R. Rutledge, Esquire
Rutledge, Ecenia, Purnell & Hoffman
P.O. Box 551
Tallahassee, Florida 32302-0551

Re:    City of Wilton Manors ("City")/Off-Premise Sign Permit Applications for the following:

| | |
|---|---|
| Property ID Number 494228080300 | Property ID Number 494227320180 |
| Property ID Number 494227230010 | Property ID Number 494227180010 |
| Property ID Number 494227350030 | Property ID Number 494228000032 |

Dear Mr. Rutledge:

As you know our law firm acts as City Attorney for the City of Wilton Manors. In connection therewith, I have received and reviewed a copy of your correspondence dated September 1, 1999, addressed to Mr. Joseph Gallegos, City Manager, regarding Off-premise Sign Permit Applications as indicated therein filed on behalf of Street Information Systems, Inc.

I have reviewed the cases cited in your letter, in addition to the unpublished opinion of the United States Court of Appeals Eleventh Circuit in the <u>National Advertising v. City of Fort Lauderdale</u> case. Additionally, I have reviewed other applicable United States Supreme Court, Eleventh Circuit Court of Appeal and other Court of Appeal and District Court opinions regarding the issues set-forth in your letter. Your letter seems to suggest that the CITY's Ordinance is unconstitutional merely because it prohibits off-premise signs.

First, it is my understanding that Street Information Systems, Inc. submitted applications for billboard signs. The CITY's Ordinance, in addition to prohibiting off-premise signs, prohibits billboard signs. In any event, based upon my review of the applicable case law, the CITY has the authority to prohibit either billboard or off-premise signs. Similar CITY wide bans have been upheld as content neutral regulations.

Additionally, the applications submitted to the CITY indicate that the type of sign is single pole, illuminated and double-faced. There are additional content neutral regulations which regulate the time, place, and manner of construction which also related to the denial of the applications. Specifically, Section 11-3D and Schedule I of the sign code provide that a pole sign may be permitted upon sites having three hundred lineal feet (300') of street frontage or which occupy fifty percent (50%) or more of the block. Pole signs are also limited to an area of sixty-four square feet (64') per side or one hundred twenty eight square feet (128') total and sixteen feet (16') maximum height. Accordingly, only one (1) of the six (6) sites for which the permit applications were submitted comply with the street frontage or fifty percent (50%) of the block requirement for a pole sign. All six (6) of the applications exceed the maximum height of sixteen feet (16') and maximum area of one hundred twenty eight square feet (128').

In any event now that I have had an opportunity to review this matter, I would appreciate it if you would contact me so that we can discuss what, if, any specific provisions of the City Sign Code you deem to be unconstitutional. Please note that it is the CITY's desire to resolve this matter amicably.

Thank you for your attention to this matter. Should you require any additional information, please contact me at (954) 771-4500, otherwise I will await your phone call.

Sincerely,

KERRY L. EZROL
City Attorney

KLE:cfjdjd
cc:   Mayor John P. Seiler
      Members of the City Council
      Joseph L. Gallegos, City Manager
      Mr. Harold Horne, Community Service Director

H:\1992\920129.WM\LETTER\rutledge3.doc

# RUTLEDGE, ECENIA, PURNELL & HOFFMAN

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

STEPHEN A. ECENIA
JOHN R. ELLIS
KENNETH A. HOFFMAN
THOMAS W. KONRAD
MICHAEL G. MAIDA
J. STEPHEN MENTON
R. DAVID PRESCOTT
HAROLD F. X. PURNELL
GARY R. RUTLEDGE

POST OFFICE BOX 551, 32302-0551
215 SOUTH MONROE STREET, SUITE 420
TALLAHASSEE, FLORIDA 32301-1841

———

TELEPHONE (850) 681-6788
TELECOPIER (850) 681-6515

OF COUNSEL:
CHARLES F. DUDLEY

GOVERNMENTAL CONSULTANTS:
PATRICK R. MALOY
AMY J. YOUNG

November 23, 1999

## VIA FEDERAL EXPRESS

Kerry L. Ezrol, Esq.
3099 East Commercial Boulevard
#200
Fort Lauderdale, Florida 33308-4311

**RE:    Street Information Systems, Inc.'s Pending Sign Permit Applications in the City
of Wilton Manors**

Dear Mr. Ezrol:

Pursuant to our telephone conversation today concerning the above referenced matter, enclosed is an opinion letter with Memorandum of Law from Myron Cohen of Hunton & Williams regarding the constitutionality of Wilton Manor's sign ordinance. I hope that this information further explains my client's position regarding the pending applications for sign permits in Wilton Manors. Upon your receipt and review of this information I would appreciate discussing this matter further with you.

Sincerely,

Gary R. Rutledge

GRR:sp
Enclosures

F:\USERS\SYLVIA\HARDIN\Ezrol.N23



EXHIBIT

D

## HUNTON & WILLIAMS

200 PARK AVENUE

NEW YORK, NEW YORK 10166-0136

TELEPHONE· 212-309-1000

TELECOPIER· 212-309-1100

November 22, 1999

951 EAST BYRD STREET
RICHMOND. VIRGINIA

1900 K STREET. N.W.
WASHINGTON. D.C

600 PEACHTREE STREET. N.E
ATLANTA. GEORGIA

101 SOUTH TRYON STREET
CHARLOTTE. NORTH CAROLINA

ONE HANNOVER SQUARE
RALEIGH. NORTH CAROLINA

900 SOUTH GAY STREET
KNOXVILLE. TENNESSEE

500 EAST MAIN STREET
NORFOLK. VIRGINIA

MCOHEN@HUNTON.COM

AVENUE LOUISE 326
BRUSSELS. BELGIUM

60 LOMBARD STREET
LONDON EC3V9EA

ULICA BAGATELA 14
WARSAW, POLAND

I TIM MEI AVENUE. CENTRAL
HONG KONG

990 RAMA IV ROAD
BANGKOK. THAILAND

201 SOUTH BISCAYNE BOULEVARD
MIAMI. FLORIDA

1751 PINNACLE DRIVE
MCLEAN. VIRGINIA

DIRECT DIAL 212/309-1020
FILE NO. 39528.7
INTERNET

Mr. Daniel Hardin
President
Street Information Systems, Inc.
3100 State Road 84
Suite 409
Fort Lauderdale, FL 33312

Dear Mr. Hardin:

You have asked for an examination of the constitutionality of the City of Wilton Manors' Sign Code Ordinance and the propriety of your organization's filing of applications for building permits to construct outdoor advertising displays which will feature both commercial and non-commercial subjects.  Our response follows.

The thrust of the Wilton Manors' sign ordinance is to authorize permanent on-premise commercial signage while completely banning permanent off-premise non-commercial as well as commercial signage with specified exemptions for certain categories of non-commercial speech.[1]  As such, the ordinance

---

[1]    The Sign Code in § II-3(P) prohibits signs whose copy is not limited to the name of the premises or uses of the property and generic words or symbols describing the products or services associated with the premises, yet each merchant in the City is entitled to erect on-premise signs indicating the product or service offered at his establishment or its name.

In similar fashion, the City violates the principles established in Metromedia by "picking and choosing" among the subjects of non-commercial speech it will allow on signage in the City.  Non-commercial signage, such as signs for places of worship, public institutions and "points of interest" are authorized by § II-5(6), while "decoration and festoons of light" signage is limited to "recognized holidays".  Temporary political signs are authorized only on stringent terms set forth in § II-5(4) and only after the filing of a written statement by the owner of the property guaranteeing the removal of the sign within 21 days after the election to which the sign

(continued...)

# HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 2

contains the constitutional infirmities afflicting the billboard ordinance reviewed by the United States Supreme Court in <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 101 S. Ct. 2882, 69 L. Ed.2d 800 (1981): commercial on-premises signs are allowed; non-commercial off-premises messages are prohibited. <u>Accord</u>: <u>Ackerley Commun. v. City of Cambridge</u>, 88 F.3d 33 (1st Cir. 1996). Moreover, the exemptions to the ordinance's restrictions, also like those before the Supreme Court in <u>Metromedia</u>, require examination of the content of non-commercial messages. In most instances, whether off-premises non-commercial signs are exempted or prohibited turns on whether or not they convey messages approved by the ordinance. <u>National Adver. v. Town of Babylon</u>, 900 F.2d 551, 555-56 (2d Cir.), <u>cert. denied</u>, 498 U.S. 852 (1990). [2]/

        Secondly, the ordinance in its prohibition of off-premises advertising violates the principles expressed in the United States Supreme Court's decision in <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410 (1993) where the Court

---

[1]/    (...continued)

pertains. Yet other non-commercial signage supporting a cause which is not the subject of an election ballot is prohibited as "off-premise" unless a City official were to determine (without any standards to guide him) that the signage represented a "permanent political sign." §II-5(C).

[2]/        Unlike the sign ordinance considered in <u>Southlake Property Associates, Ltd. v. City of Morrow, Georgia</u>, 112 F.3d 1114 (11 Cir. 1997), the Wilton Manors Sign Code Ordinance contains no ambiguity concerning its treatment of signs carrying non-commercial messages. The structure of the ordinance clearly regards signage carrying non-commercial speech as encompassed within its terms. The framers of the Ordinance took care to determine that certain subjects of non-commercial speech, though clearly off-premise, could be erected. § II-5(C), for example, expressly authorizes political campaign signs, an example of non-commercial speech which would not need specific authorization if the Ordinance were to apply only to commercial signage. In similar fashion, § II-5(A)(6)(a) authorizes signs for places of worship, public institutions and points of interest; § II-5(A)(6)(b) permits signs relating to the names of neighborhood civic associations; § II-3(C)(1) permits governmental information signs; and § II-3(C)(2) authorizes the erection of historical markers. Other non-commercial signage supporting a cause which is not the subject of an election ballot is prohibited as "off-premise" unless a City official determines that such signage represents a "permanent political sign." §II-5(C).

        Thus a court considering a facial challenge to the legality of the Wilton Manors Sign Code Ordinance cannot avoid the constitutional problems raised by the measure as the Circuit Court did in <u>Southlake</u>. 112 F.3d at 1119.

## HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 3

disallowed restrictions on commercial speech because of the
failure of the regulation to support the government's purpose in
enacting it. The Wilton Manors' sign ordinance recognizes the
importance of on-premise signage to identify and advertise the
business conducted on premise.[3/] Yet a sign causes the same
impact whether it is advertises "on premise" or "off-premise"
activities or services:  if it interferes with a view or impacts
upon traffic control when it describes a product or service sold
or conducted on the premises, it is irrational to conclude that
the sign will not present the same problems when it advertises a
product or service sold off-premise.  The distinction drawn bears
no relationship to the City's asserted interests in maintaining
an attractive appearance and avoiding traffic confusion.  If the
City's concern were truly to promote aesthetics or safety, it
would not have allowed identical structures to exist,
distinguished from the prohibited structures solely by the
content of their wording.  Wilton Manors could have achieved the
desired effects much more easily (and constitutionally) simply by
limiting all signage, whether on-premise or off-premise, through
regulation of the locations in which all signs could be posted;
by restriction upon the number of sign structures (whatever they
advertised) per lot; or through restrictions on the size of the
sign structures, whatever the nature of the wording contained on
the sign faces.  Where less restrictive means are available, it
is incumbent upon the municipality to choose those means if it
wishes to advance its purported interest in conformance with the
Constitution.  In its treatment of on-premise and off-premise
signage, Wilton Manors has simply not done so.

Finally, the sign code's treatment of political speech
clearly violates constitutional jurisprudence.  First, the
ordinance contains unacceptable durational limitations on
political signs.  The ordinance treats commercial signage more
favorably than political signage.  Pursuant to § II-5 (C),
political signage connected with a pending election is allowed on
a temporary basis only with a candidates's signs authorized only
if the person or organization erecting the sign has filed a
written statement with the Community Services Director
guaranteeing the removal of the sign within twenty one days after
the election to which the sign pertains.  On-premises commercial

---

[3/]    Section II-3(P) requires all copy to relate to "the name of the
premises or uses of the property and generic words or symbols which describe
products or services".  Expressly prohibited by §§ II-4(G)(2) and II-4(G)(4)
are billboards and off-premises signs.

HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 4

signage, however, is unlimited in duration while temporary
construction signage may remain from the issuance of a building
permit until prior to the issuance of a Certificate of Occupancy.
See Schedule 3.

        Significantly, political signage is also subject to
restrictions absent from any other type of signage allowed by the
City.  A person found violating any provision of the article
relating to political signs is subject to a $500 fine and/or a
period of imprisonment of up to 60 days.  § II-5(C)(5)(b).
No such durational or forfeiture provision is required for on-
premise permanent signage. See  Whitton v. City of Gladstone, 54
F.3d 1400 (8 Cir. 1995), where the court relied upon Discovery
Network to affirm an order holding provisions of the
municipality's sign code regulating political speech--
substantially similar to those employed by the City of Wilton
Manors-- unconstitutional.  Accord:  Outdoor Sys., Inc. v. City
of Merriam, Kan., 1999 U.S. Lexis 14806, at * 23 ("Nearly every
court to address the issue has held that the government interest
in aesthetics and safety is insufficient to justify a durational
restriction on political signs in residential districts").

        Secondly, the ordinance lacks any standards to guide
the discretion of the officials in determining whether a sign
referring to a non-commercial cause is exempted from regulation
as "a permanent political sign" or subject to the requirements of
§ II-5(c) as one "relating to elections" and hence subject to a
temporary permit requirement because it refers to a "measure on
an election ballot".

        What of a resident who posts a sign upon his business
premises on an issue of the day which is only peripherally
connected to the election campaign?  Was it a true "ballot issue"
for which a temporary sign permit may be issued, or a "permanent
political sign" as to which § II-5 is inapplicable, or is it
simply an off-premise sign which the Ordinance expressly
prohibits?  What if a business desires to take a stand on an
environmental issue important to it which may or may not be a
factor in an election campaign?  The Sign Code grants the
building inspector total discretion to determine whether the
offending sign is a permitted "ballot issue" which may remain for
a time or must be removed immediately (or denied a permit) as a
prohibited off-premise sign.  This is precisely the type of vague
standard that violates the First Amendment.  See, e.g., Staub v.
City of Baxley, 355 U.S. 313, 322, 78 S. Ct. 277, 282, 2 L. Ed.
2d 302 (1958); North Bay Village v. Blackwell, 88 So. 2d 524, 526

HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 6

Amendment rights of third parties as well as Street Information
Systems's own free speech rights.  Although your organization has
a commercial interest in the speech regulated by the Ordinance,
it nevertheless has the right to assert a claim, in its own
behalf and for third parties, that the Ordinance is
unconstitutional because of its effects upon non-commercial
interests.  <u>National Adver. Co. v. City of Fort Lauderdale</u>, 934
F.2d 283 (11 Cir. 1991).

        In the absence of a lawful sign ordinance, your
applications for sign permits should be granted.  Florida courts
consistently hold that a building permit application creates
vested rights.  They also consistently hold that an application
for a building permit does not have to comply with unlawful or
unconstitutional requirements in order to endow the applicant
with vested rights.

        An unconstitutional zoning ordinance is a void
ordinance.  Florida decisions hold that landowners are entitled
to use their property in disregard of unconstitutional zoning
ordinances.  As long as the proposed use complies with all other
lawful regulations, the landowner may proceed as though the
unconstitutional ordinance does not exist.  The Florida courts
which have established this principle have reasoned that once an
applicant satisfies all lawful requirements for a permit, the
governmental authority is divested of all discretion and cannot
refuse approval of the application.  The Eleventh Circuit has
long endorsed and applied those principles.  <u>See</u> <u>Southern
Cooperative Fund v. Driggers</u>, 696 F.2d 1347 (11th Cir.), <u>cert</u>.
<u>denied</u>, 463 U.S. 1208, 103 S. Ct. 3539, 77 L. Ed. 2d 1389 (1983).

        The issue was most recently addressed in litigation
between Fort Lauderdale and National Advertising Company in the
Eleventh Circuit Court of Appeals described in detail in the
accompanying memorandum and the Eleventh Circuit opinion attached
thereto.

        In conclusion, it is our opinion that Street
Information Systems, Inc. is fully entitled to question the
ordinance upon its acquisition of leasehold interests and
thereafter to obtain building permits.  As the Florida appellate
courts have noted, "A late arriving owner is no less affected by

HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 5

(Fla. 1956); Drexel v. City of Miami Beach, 64 So. 2d 317, 319
(Fla. 1953) (en banc).

It is questionable whether the City could
constitutionally allow local officials to make the standardless
determination of what constitutes a "permanent political" sign
unconnected to an on-going election. Cf. United States Civil
Service Comm'n v. National Association of Letter Carriers AFL-
CIO, 413 U.S. 548, 569-74, 37 L.Ed.2d 796, 93 S. Ct. 2880 (1973).
Recently, the Maryland federal court in Curry v. Prince George's
County, 33 F. Supp. 2d 447, 448 (D. Md. 1999) invalidated an
ordinance imposing durational limits with respect to campaign
signs and, in so doing, emphasized the difficulties which would
be faced in determining whether a "cause" sign advocating, for
example, "Peace in the Gulf", was a "political sign" subject to
the sign code's restrictions:

> In the first place, there is no natural
> terminal date for a "cause" sign; a cause and
> a private resident's passion for it exists as
> long as the cause exists. Yet the Court in
> Ladue speaks interchangeably of "cause" and
> "political" signs. See 512 U.S. at 55.
> Moreover, a number of problems arise in
> attempting to make any distinctions between
> the two. To recur to Plaintiffs' arguments
> on the void-for-vagueness issue:
>
> When does a "cause" sign cease being a
> "cause" sign and become a "political" one?
> If a "cause" sign is linked to a political
> candidate or a ballot question and the
> candidate or ballot fails, what happens if
> the private resident wishes to continue
> promoting the cause after the election?
> Ultimately, why is the expression of personal
> support for a viable reform candidate capable
> of bringing immediate changes to government
> any less deserving of support than the
> expression of an opinion in support of a
> cause that is fringe in nature and which has
> little or no hope of ever becoming a reality?

Id. at 454.

Because of these defects, the Wilton Manors sign
ordinance is facially unconstitutional. It infringes on the First

## HUNTON & WILLIAMS

Mr. Daniel Hardin
November 22, 1999
Page 7

the enforcement of a void (nonexistent) ordinance than had he
been present a lifetime.  He is being denied the right to use his
property in a way permitted by all legal city restrictions."
Bhoola v. City of Saint Augustine Beach, 588 So.2d 666, 667 (Fla.
App. 1991).

Sincerely,

Myron D. Cohen

MDC:as
Enclosure

November 22, 1999

## Memorandum on the Constitutionality of the Sign Ordinance of The City of Wilton Manors, Fla.

In recent years the Supreme Court's primary requirement in First Amendment cases has been to ensure that regulation of First Amendment activity be content-neutral. This concern was initially reflected in the early public forum cases where the Court struck down discretionary licensing schemes because of the possibility of viewpoint discrimination. In more recent years the Court has extended the prohibition to any content-based regulation, stating that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972).

The plurality in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 513-14 (1981), on remand, 649 P.2d 902 (Cal. 1982), emphasized the need for strict content-neutrality when it held not only that the sign ordinance's perceived preference for commercial over non-commercial speech was invalid, but also that the various non-commercial speech exemptions were invalid. Although a majority of the Court found the particular restrictions valid as applied to commercial speech, it found the ordinance invalid as applied to non-commercial speech, without agreeing on a rationale. Id. at 514-15. The decision produced five separate opinions, with only a portion of one opinion gaining a majority of the Court.

The variety of opinions and nature of the ordinance in Metromedia limit its precedential value. Since Metromedia was decided in 1981, municipalities seeking to comply with its dictates have typically enacted ordinances which attempted to regulate signage by imposing basic restrictions on size, design and placement and number of signs without regard to the messages expressed on the structures. Where a distinction has been made in the treatment of on-premise and off-premise signage, ordinances found to be in compliance with the Constitution have specifically exempted off-premise non-commercial signage from regulation or authorized non-commercial signage to be placed wherever on-premise signage was allowed. See, e.g., Major Media of the Southeast v. City of Raleigh, 621 F. Supp. 1446, 1448 (E.D.N.C. 1985) (sign ordinance does not apply to non-commercial speech), aff'd, 792 F.2d 1269 (4th Cir. 1986), cert. denied, 479 U.S. 1102 (1987). The City of Wilton Manors' ordinance, however, neither exempts non-commercial speech from its general ban on off-premise signage nor does it contain a substitution clause. Indeed, it expressly limits the use of off-premise signage carrying non-commercial messages (see, for example, § II-5(4) dealing with political campaign signs), while its exemptions from the ban in any case violate the First Amendment requirement of content-neutrality. See, e.g., National Adver. Co. v. Town of Babylon, 900 F.2d 551, 554 (2d Cir.), cert. denied, 498 U.S. 852 (1990); Dimmitt v. City of Clearwater, 985 F.2d 1565, 1570 (11th Cir. 1993).

2

The Wilton Manors sign ordinance recognizes the importance of on-premise signage to identify and advertise the business conducted on site.  It denigrates off-premise advertising because of a professed governmental interest in aesthetics and traffic safety. Yet a sign causes the same impact whether it is designated "on premise" or "off-premise":  if it interferes with a view or impacts upon traffic control when it describes a product that is not sold on the premises, it is irrational to conclude that the sign will not present the same problems when it advertises a product sold on-site.

The City's justification raises serious questions concerning the credibility of its professed need to ban all off-premise advertising displays.  See Chicago Newspaper Publishers Ass'n v. City of Wheaton, 697 F. Supp. 1464, 1470 (N.D. Ill. 1988) (noting that city "has not explained. . . how a newsrack on a residential street destroys the "character" of the neighborhood any more than a mailbox, utility pole, fire hydrant, or traffic sign).

In order to single out one type of advertising-- off premise advertising-- for unfavorable treatment, Wilton Manors must relate its articulated interest in traffic safety and aesthetics to the distinction drawn by the statute.  The Supreme Court addressed this issue in City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993), a case involving a city ordinance prohibiting the distribution of commercial handbills on public property.  The ordinance at issue barred the plaintiffs

3

from distributing a free magazine, which advertised real estate
for sale and provided information about other real estate
matters, in freestanding newsracks located on public property.
Non-commercial publications, such as newspapers, were not
similarly restricted.

The City attempted to justify its ban by asserting an
interest in the safety and aesthetics of its streets and
sidewalks. Specifically, the City argued that any decrease in
the number of newsracks resulted in an increase in the safety and
attractiveness of the City. The Court accepted the basic
validity of this argument "but considered it an insufficient
justification for the discrimination against respondent's use of
newsracks that are no more harmful than the permitted newsracks,
and have only a minimal impact on the overall number of newsracks
on the city's sidewalks." Discovery Network, 507 U.S. at 418.
The Court found the content discrimination between commercial and
non-commercial speech irrational, noting that "the city's
argument attaches more importance to the distinction between
commercial and noncommercial speech than our cases warrant and
seriously underestimates the value of commercial speech." 507
U.S. at 419.

What the majority decision in Discovery Network has
done is to change the burden of proof applicable to the
governmental body seeking to uphold its zoning. A city
justifying its sign code restrictions on commercial off-premise
speech can no longer simply rely on the naked assertion of an

4

"on-premise/off-premise" distinction; it must now prove that its
ordinance will alleviate the harms which led to its passage and
that the solution imposed by statute was a "reasonable fit"
between the legislature's ends and the means chosen.    To do so,
the government must show that its goal was substantial, and the
cost carefully calculated.    It is the government, said Justice
Stevens, which has the burden to "affirmatively establish the
reasonable fit we require."    Id. at 417.    Cincinnati had failed
to meet this burden.    Stevens stated, in language equally
applicable to billboards:

> The city has asserted an interest in
> esthetics, but respondent publishers'
> newsracks are no greater an eyesore than the
> newsracks permitted to remain on Cincinnati's
> sidewalks.    Each newsrack, whether containing
> "newspapers" or "commercial handbills," is
> equally unattractive.
>
>         * * * *
>
> Here, the city contends that safety concerns and visual
> blight may be addressed by a prohibition that
> distinguishes between commercial and noncommercial
> publications that are equally responsible for those
> problems. . . .

Id. at 425, 426-27.

In its later decision in City of Ladue v. Gilleo, 512
U.S. 43 (1994), the Court reaffirmed Metromedia as modified by
Discovery Network.    The key portion of Ladue is the section
dealing with the City's argument that it could legitimately
distinguish between on premise and off premise signage because of
the "side effects" of the prohibited signs, i.e., the danger or
"unlimited proliferation" associated with signs that are not

5

0000315

inherently limited in number, such as "for sale" signs or,
perhaps, on-premise advertising. The Ladue court dealt with this
argument by denigrating the validity of the public policy reasons
expressed by the City. Noting that Ladue's ordinance contained a
general prohibition of "signs" except those that fell within one
of ten exemptions, the Court declared:

> Exemptions from an otherwise legitimate
> regulation of a medium of speech may be
> noteworthy for a reason quite apart from the
> risks of viewpoint and content
> discrimination; they may diminish the
> credibility of the government's rationale for
> restricting speech in the first place. See,
> e.g., Cincinnati v. Discovery Network, Inc.,
> 507 U.S. 410, 424-26, 113 S. Ct. 1505, 1514-
> 15, 123 L. Ed. 2d 99 (1993). In this case,
> at the very least, the exemptions from
> Ladue's ordinance demonstrate that Ladue has
> concluded that the interest in allowing
> certain messages to be conveyed by means of
> residential signs outweighs the City's
> aesthetic interest in eliminating outdoor
> signs. Ladue has not imposed a flat ban on
> signs because it has determined that at least
> some of them are too vital to be banned.

Recent caselaw emphasizes the heavy burden placed on
municipalities seeking to justify restrictive sign legislation.
In many instances, the burden of justification proves
insurmountable. For example, in Outdoor Sys., Inc. v. City of
Merriam, Kan., No. 98-2397, 1999 U.S. Dist. LEXIS 14806 (D. Kan.
Aug. 30, 1999), the plaintiff outdoor advertising agency had sued
for the right to construct permanent off premise signage on
property zoned for commercial and industrial uses. Id. at *3.
It claimed that the defendant municipality's sign ordinance,
which contained many of the same defects as that found in the

6

sign ordinance of the City of Wilton Manors, was facially

unconstitutional as violative of the First Amendment. Id. at *9.

Under Merriam's ordinance, only on-premise signs were

permissible. Id. at *15. Off-premise signage was prohibited

unless it satisfied specified exemptions, including temporary

signs of a civic, political or religious nature, certain flags,

and holiday decorations. Id. The court declared:

> The critical inquiry is whether the
> ordinance categorizes permissible
> noncommercial signs by reference to the
> content of the messages conveyed.
>
> *   *   *   *
>
> Common sense dictates that these distinctions are
> content-based because "determining whether a sign may
> stay up or must come down requires consideration of the
> message it carries." Ackerly Communications of Mass.,
> Inc. v. City of Cambridge, 88 F.3d 33, 36 n.7 (1st Cir.
> 1996) (citing City of Cincinnati v. Discovery Network,
> Inc., 507 U.S. 410, 427-31, 123 L. Ed. 2d 99, 113 S.
> Ct. 1505 (1993))

1999 U.S. Dist. LEXIS 14806 at * 12,*15.

Merriam had also argued that its ordinance must be

construed to be content-neutral with respect to non-commercial

speech because such speech should categorically be classified as

"on-site". Id. at *20. The court rejected this argument because

the City had failed to show that its ordinance did in fact permit

without restriction all forms of non-commercial speech. Id. at

*21. Wilton Manors' sign ordinance expressly regulates non-

commercial off-premise speech such as political campaign signs

(limited in duration) and decorations and festoons of light

(limited to "recognized holidays")-- limitations wholly

7

unnecessary if all non-commercial signage were simply to be regarded as on-premise and hence allowable -- and so too did the Merriam ordinance. The court there noted:

> A common sense reading of the ordinance
> reveals that a sign placed on Main Street
> which reads "Attend Political Rally on State
> Street" does not direct attention to a
> business, commodity, service or entertainment
> on the premises where the sign is located. In
> a similar fashion, a sign on the premises of
> a widget factory which states "God saves"
> does not fall within any category of
> permanent signs which are allowed by the
> ordinance. Not all noncommercial speech is
> permitted under the Merriam ordinance.

Id. at * 21-*22.

The court concluded that the ordinance was constitutionally defective because, by restricting civil, political and religious speech to signs which might not be displayed more than 30 days in one year, the City had placed greater value on-premise speech (both commercial and non-commercial) than civic, political or religious speech. Id. at 25.

The court, in holding that the provisions in question did not survive strict scrutiny under the First Amendment, declared:

> Defendant has not shown, or even argued, any
> aesthetic or traffic safety distinction
> between these various types of signs. The
> Court is not aware of any aesthetic or
> traffic safety difference between a "Vote for
> Joe" sign (which is restricted to 30 days)
> and a "Joe's Pizza" sign (which may be
> permanent). The ordinance limits the
> subjects and duration of many types of
> noncommercial signs while it allows permanent
> on-site commercial advertising signs.

8

> Defendant has failed to show that the
> ordinance's restrictions on speech are
> narrowly tailored to achieve a compelling
> state interest.

Id. at *26; accord : Statesboro Publ'g Co. v. City of Sylvania,
516 S.E.2d 296, 297 (Ga. 1999); Rockwood v. City of Burlington,
21 F. Supp. 2d 411, 414 (D. Vt. 1998); Washington Legal Found. v.
Henney, 56 F.Supp. 2d 81, 87 (D.D.C. 1999); Knoll Pharm. Co. v.
Sherman, 57 F.Supp. 2d 615, 622-23 (N.D. Ill. 1999); People v.
Jones, 702 N.E.2d 984, 988 (Ill. App. Ct. 1998).

On June 14 of this year the Supreme Court came down
with a long awaited decision in a major commercial speech case,
Greater New Orleans Broad. Ass'n, Inc. v. United States, 119 S.
Ct. 1923 (1999). The case had been argued in April, and the
decision, when it was rendered, was joined in by all of the
Justices. It held unconstitutional a federal law prohibiting
some, but not all, broadcast advertising of lotteries and casino
gambling and it did so in a manner which directly supports our
contention that the Wilton Manors ordinance is wholly
unconstitutional. Id. at 1932.

The plaintiffs in Greater New Orleans were an
association of Louisiana broadcasters and its members who
operated licensed radio and television stations in the New
Orleans metropolitan area. Id. at 1928. They had been
prohibited by the threat of sanctions from broadcasting
promotional advertisements for gambling available at private
casinos. Id. The casinos were lawful and regulated in Louisiana
and neighboring Mississippi, but the broadcasts could be heard in

9

Texas and Arkansas, where private casino gambling was unlawful.
Id. The Court unanimously held that the federal ban on such
broadcast advertising-- although in existence for sixty five
years-- violated the First Amendment because it "sacrifice[d] an
intolerable amount of truthful speech about lawful conduct."
Id. at 1935.

It is clear from the decision that the entire Court now
subscribes to the opinion in Discovery Network and will no longer
tolerate exceptions to a ban on truthful commercial speech if the
exceptions pose the same risks that the Government purports to
fear from messages prohibited.

Justice Stevens pointed out that there were less
restrictive alternatives available to the federal government than
a ban on private casino advertising:

> While Congress' failure to institute such direct
> regulation of private casino gambling does not
> necessarily compromise the constitutionality of § 1304,
> it does undermine the asserted justifications for the
> restriction before us.  There surely are practical and
> nonspeech- related forms of regulation-- including a
> prohibition or supervision of gambling on credit;
> limitations on the use of cash machines on casino
> premises; controls on admissions; pot or betting
> limits; location restrictions; and licensing
> requirements-- that could more directly and effectively
> alleviate some of the social costs of casino gambling.

Id. at 1934 (citation omitted).

The Court concluded:

> Furthermore, even assuming that the state policies
> on which the Federal Government seeks to embellish are
> more coherent and pressing than their federal
> counterpart, § 1304 sacrifices an intolerable amount of
> truthful speech about lawful conduct when compared to
> all of the policies at stake and the social ills that
> one could reasonably hope such a ban to eliminate. . .

10

> [T]he regulation distinguishes among the indistinct,
> <u>permitting a variety of speech that poses the same
> risks the Government purports to fear</u>, while banning
> messages unlikely to cause any harm at all . . . .
>
> Accordingly, respondents cannot overcome the
> presumption that the speaker and the
> audience, not the Government, should be left
> to assess the value of accurate and
> nonmisleading information about lawful
> conduct.

<u>Id.</u> at 1935 (emphasis added).

This caselaw makes clear that the burden placed on Wilton Manors to justify its ban on off-premise outdoor advertising is a heavy one, even if only the effects of the ban on commercial speech interests are considered. The City will not be able to establish that any perceived evils from off-premise advertising could not be addressed by restricting the location or the number of advertising sign structures rather than banning off-premise advertising completely.  Plainly, such obvious alternatives, if efficacious, would be much less burdensome on the important First Amendment expressive activity that the City bans outright. <u>Cf. Globe Newspaper Company v. Beacon Hill Architectural Comm'n</u>, 100 F.3d 175, 197 (1st Cir. 1996).

In <u>44 Liquormart, Inc. v. Rhode Island</u>, 517 U.S. 484 (1996), the Supreme Court overturned Rhode Island's complete ban on liquor price advertising because the state had "failed to carry its heavy burden" of justifying its regulation of commercial speech.  Justice Stevens announced the judgment of the court.  Joined by Justices Kennedy, Souter and Ginsberg, he declared that when regulations suppressed commercial speech "in

11

order to pursue a policy not related to consumer protection",
they must be reviewed with special care. Id. at 485. Stevens
noted that "special concerns arise from regulations that entirely
suppress commercial speech in order to pursue a nonspeech-related
policy" and that "in recent years this Court has not approved a
blanket ban on commercial speech unless the speech itself was
flawed in some way, either because it was deceptive or related to
unlawful activity." Id. at 500 (internal quotations omitted).

In the course of his opinion, Justice Stevens declared:

> Advertising has been a part of our culture
> throughout our history. Even in colonial
> days, the public relied on "commercial
> speech" for vital information about the
> market. Early newspapers displayed
> advertisements for goods and services on
> their front pages, and town criers called out
> prices in public squares. Indeed, commercial
> messages played such a central role in public
> life prior to the Founding that Benjamin
> Franklin authored his early defense of a free
> press in support of his decision to print, of
> all things, an advertisement for voyages to
> Barbados.

Id. at 495 (citations omitted).

In the portion of his opinion joined by Justices
Kennedy and Ginsberg, Justice Stevens wrote:

> Most obviously, complete speech bans, unlike
> content-neutral restrictions on the
> time, place, or manner of expression, see
> Kovacs v. Cooper, 336 U.S. 77, 89, 69 S.Ct.
> 448, 454-55, 93 L. Ed. 2d 513 (1949), are
> particularly dangerous because they all but
> foreclose alternative means of disseminating
> certain information. . . . [B]ans that target
> truthful, nonmisleading commercial messages
> rarely protect consumers from such harms.
> Instead, such bans often serve only to
> obscure an underlying governmental policy

12

> that could be implemented without regulating
> speech.

Id. at 502-03 (citations omitted) (footnote omitted).

In evaluating the effectiveness of the ban in supporting the government's purpose, Justice Stevens stated that the ban must not only advance the State's interest, the State must prove that it would do so "to a material degree." Id. at 486. "The need for the State to make such a showing is particularly great given the drastic nature of its chosen means-the wholesale suppression of truthful, nonmisleading information." Id. at 505. The State, however, had not met its burden in that case. Stevens wrote: "[W]ithout any findings of fact, or indeed, any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance." Id. To do so "would require us to engage in the sort of "speculation or conjecture" that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest." Id. at 507 (citing Edenfield v. Fane, 507 U.S. 761, 770 (1993)).

A review of the caselaw cited herein makes it clear that Wilton Manors' ban on off-site commercial advertising is obviously not tailored to meet its purported goal. If the City's concern were truly to promote aesthetics or safety, it would not have allowed identical structures to exist, distinguished from the prohibited structures solely by the content of their wording.

Equally significant, no attempt was made by the City to

13

limit its ban on off-site commercial signage to certain areas.
In <u>Sciarrino v. City of Key West, Florida</u>, 83 F.3d 364, 369 (11th
Cir. 1996), <u>cert. denied</u>, 519 U.S. 1092 (1997), for example, an
ordinance limiting the location of off-premises solicitation was
upheld because the offending conduct was designed to apply only
to specified areas in Key West's historic district.  In stark
contrast to the Key West ordinance, the Wilton Manors ordinance
bans off-premises commercial speech displays throughout the City.

The City's ordinance leads irrevocably to the banning
of an entire expressive medium.  There is no question that the
outdoor advertising industry constitutes a particular forum.
Indeed, the Fourth Circuit has upheld a finding that billboards
in the Columbia, South Carolina area are not substitutable with
advertising in any other media and that there is little, if any,
cross-elasticity of demand.  <u>See</u> <u>Omni Outdoor Adver. v. Columbia</u>
<u>Outdoor Adver.</u>, 891 F.2d 1127, 1142 (4th Cir. 1989), <u>rev'd on</u>
<u>other grounds</u>, 499 U.S. 365 (1991).  And Justice Brennan,
concurring with Justices Blackman and Marshall in <u>FW/PBS, Inc. v.</u>
<u>City of Dallas</u>, 493 U.S. 215, 239 n.1 (1990) has noted that the
U.S. Supreme Court has <u>never</u> abrogated First Amendment protection
for an entire category of speech-related businesses.

Wilton Manors could have achieved the desired effects
much more easily (and constitutionally) simply by limiting all
signage, whether on-premise, non-commercial or off-premise,
through regulation of the locations in which all signs could be
posted; by restriction upon the number of sign structures

14

(whatever they advertised) per lot; or through restrictions on the size of the sign structures, whatever the nature of the wording contained on the sign faces.

Where less restrictive means are available, it is incumbent upon the municipality to choose those means if it wishes to advance its purported interest in conformance with the Constitution. Wilton Manors simply failed to do so. Its ordinance is therefore unconstitutional, and like the Fort Lauderdale ordinance discussed infra, cannot be saved by severance since the unconstitutional provisions are inextricably intertwined. See National Adver. Co. v. Town of Babylon, 900 F.2d 551, 557 (2 Cir.), cert. denied, 498 U.S. 892 (1990) reversing the district court's finding that sign ordinances similar in nature and design to that of Wilton Manors could be saved by severance of their unconstitutional provisions and holding:

> The critical issue is whether the legislation would have been enacted if it had not included the unconstitutional provisions. . .
>
> Inasmuch as Freeport itself recognizes that its ordinance "is a comprehensive regulatory scheme intended to regulate many different forms of commercial and non-commercial speech," we find the constitutional and unconstitutional provisions to be inextricably interwoven, lending further support to the presumption of nonseverability. The district court had to rewrite the Freeport and Islip ordinances substantially in order to save them, a practice which is decidedly disfavored.

15

900 F.2d at 557 (emphasis added) (citations omitted). [1]

Likewise, the Wilton Manors sign ordinance purports to be a comprehensive code regulating the use of outdoor advertising throughout the city.  It regulates the use of commercial signs, political campaign signs, signs for places of worship, public institutions and points of interest, signs relating to the names of neighborhood civic associations, governmental information signs, and historical markers.  See §§ II-5(C), II-5(A)(6)(a), II-5 (A)(6)(b), II-3 (C)(1) and II-3(C)(2).  And here too the unconstitutional and constitutional provisions of the Wilton Manors' sign ordinance are "inextricably interwoven."

The 1990's Fort Lauderdale Litigation

The writer had occasion to litigate the constitutionality of an ordinance similar to Wilton Manors' sign ordinance a few years ago in the District Court for the Southern District of Florida before District Judge Zloch and in the Eleventh Circuit Court of Appeals.  The results are instructive. In National Adver. Co. v. City of Fort Lauderdale, 934 F.2d 283 (11th Cir. 1991) and, following remand to the District Court, National Adver. Co. v. City of Fort Lauderdale, 8 F.3d 36 (11th Cir. 1993), the parties litigated the constitutionality of the Fort Lauderdale sign ordinance.

---

[1]    All the municipal ordinances challenged by National in the Town of Babylon litigation were held unconstitutional in their entirety. Some $300,000 in counsel fees were awarded- and paid-- by the towns to National following a second appeal.

16

Since 1974, Fort Lauderdale had in effect a comprehensive sign ordinance regulating the use of outdoor advertising within the city limits. 934 F.2d at 284. The City's sign code effected a broad ban on outdoor advertising, allowing only on-premise signs and specifically banning all off-premise signs and billboards with specified exemptions. Id. At the time National filed its complaint, the sign code had permitted advertising signs of public interest but only if approved by resolution of the city commission. Id.

National had sought permits for off-premise advertising displays containing both commercial and non-commercial messages. Id. It had filed suit seeking declaratory and injunctive relief. Id. The suit alleged identical constitutional defects as we believe are possessed by the Wilton Manor ordinance, that the sign code was unconstitutional in its entirety, and that National as a consequence had vested rights to construct billboards. Id. at 284-85.

After filing its lawsuit, National submitted applications for the construction of 20 billboards. Id. at 284. Six weeks later, the City amended its sign code to deal with the allegations of the complaint. One of the amendments allowed any authorized sign to contain non-commercial copy in place of commercial copy. Id. Another amendment deleted the prior restraint upon public interest advertising. Id. at 284-85. The City then moved to dismiss the complaint on the ground that the amendments rendered National's claims moot and, argued that, in

17

any event, National was without standing to pursue the matter.
District Judge Zloch granted the City's motion and National filed
its first appeal in the action.  Id. at 285.

On appeal the Eleventh Circuit disposed of both the
standing and mootness arguments.  With respect to standing, the
Circuit Court held:

> Although National has a commercial interest
> in the speech regulated by the sign code, it
> nevertheless has the right to assert a claim,
> in its own behalf and for third parties, that
> the code is unconstitutional.  Therefore, we
> conclude that National has standing to assert
> its claims.

Id.

The Circuit Court also rejected the City's claim that
its official discontinuance of the allegedly offensive conduct
had mooted National's claims.  It labelled the law as being "well
settled" in that

> a defendant's voluntary cessation of a
> challenged practice does not deprive a
> federal court of its power to determine the
> legality of the practice. . . . The city's
> repeal of the objectionable language would
> not preclude it from reenacting precisely the
> same provision if the District Court's
> judgment were vacated.

Id. at 286 (quoting City of Mesquite v. Aladdin's Castle, Inc.,
455 U.S. 283, 289 (1982)); accord Solomon v. City of Gainesville,
763 F.2d 1212, 1213 n.1 (11th Cir. 1985).

On the remand, the district court had been ordered by
the Eleventh Circuit to determine whether the original sign code
violated the free speech clause of the First Amendment; secondly,
if the lower court were to determine that some or all of the

18

0600328

challenged provisions were unconstitutional, it was next to consider whether or not those provisions were severable from the remainder of the sign code; and, finally, if it were to hold that the entire sign code was in fact unconstitutional, the court had to decide whether, under Florida law, National had secured vested rights by the filing of its permit applications to build billboards on its property.   934 F.2d at 286.

Upon the remand, National renewed its contentions that the Fort Lauderdale sign code (like that of Wilton Manors) contained various constitutional defects.   First, by permitting on-site outdoor commercial advertising while prohibiting any outdoor non-commercial advertising, the sign code improperly favored commercial speech over non-commercial speech.   Second, the exceptions to the code's prohibition of off-site advertising were content-based, impermissibly favoring certain forms of non-commercial speech over other forms of non-commercial speech.   And third, the city commission was possessed of unbridled discretion in deciding whether to permit certain signage, in that case public interest advertising.

Judge Zloch agreed with National that the old sign ordinance unconstitutionally differentiated between commercial and non-commercial speech.   Because the content-based provisions were unseverable from the rest of the ordinance, he entered judgment declaring that the old sign ordinance was <u>wholly</u> unconstitutional.   Judge Zloch, however, held that filing under the old sign ordinance gave National no vested rights-- both the

19

old ordinance and the new had prohibited billboards-- and he
refused to enjoin enforcement of the sign ordinance because the
City was unlikely to reenact the old, unconstitutional sign
ordinance and no party had challenged the new one.

National appealed.  The Circuit Court of Appeals
reversed Judge Zloch again, holding that when a party submits an
application that satisfies all existing and pending laws, the
municipality lacks authority under Florida law to deny the
permit.  <u>National Adver. Co. v. City of Fort Lauderdale</u>, No. 92-
4750, Slip Op. at 4 (11th Cir. Oct. 26, 1993).[2/]  The Court
held that because no valid law banned billboards when the permits
were applied for, the permits should have issued.  Slip Op. at 4-
5, copy attached.

It is noteworthy that National's right to erect its
billboards ultimately rested upon its claim that under state law,
its sign applications gave it vested rights.  In <u>National Adver.
Co. v. Town of Babylon</u>, 900 F.2d 551, 554 n.2 (2d Cir.), <u>cert.
denied</u>, 498 U.S. 892 (1990), amendments of sign codes during the
course of the litigation had also led the defendant
municipalities to raise claims of mootness.  The Circuit Court
rejected the mootness challenge, relying on <u>City of Mesquite</u>,
<u>supra</u>, as did the Eleventh Circuit in National's action in that

_____

[2/]    The Eleventh Circuit's second opinion, per curiam, was
unpublished.  Nonetheless, pursuant to 11th Cir. R.36-2, it may
be provided to a court if the court is furnished with a copy of
the unpublished opinion.  <u>National Adver. Co. v. City of Fort
Lauderdale</u>. 8 F.3d 36 (11th Cir. 1993).  Following the decision,
the parties settled.

Court.  It further declared, "In addition, <u>this appeal is not moot because National might have secured some vested rights under state law in the interim.</u>"    900 F.2d at 554 n.2 (emphasis added).

In an action against Wilton Manors, Florida Outdoor Advertising's right to building permits will also depend upon a declaration that the City's sign ordinance is void in its entirety.  An unconstitutional zoning ordinance is a void ordinance.  Florida decisions have consistently held that landowners are entitled to use their property in disregard of unconstitutional zoning ordinances.  As long as the proposed use complies with all other lawful regulations, the landowner may proceed as though the unconstitutional ordinance does not exist.

The Florida courts which have established this principle have reasoned that once an applicant satisfies all lawful requirements for a permit, the governmental authority is divested of all discretion and cannot refuse approval of the application. If the result were otherwise, official approval of a permit application would depend upon the caprice of local officials. <u>See, e.g.</u>, <u>City National Bank of Miami v. City of Coral Springs</u>, 475 So. 2d 984, 985 (Fla. Dist. Ct. App. 1985); <u>City of Lauderdale Lakes v. Corn</u>, 427 So. 2d 239, 242 (Fla. Dist. Ct. App. 1983); <u>City of Gainesville v. GNV Investments, Inc.</u>, 413 So. 2d 770, 771 (Fla. Dist. Ct. App. 1982); <u>Broward County v. Narco Realty, Inc.</u>, 359 So.2d 509, 510-11 (Fla. Dist. Ct. App. 1978). As stated in such decisions as <u>City of Lauderdale Lakes v. Corn</u>,

21

427 So. 2d at 239, an applicant has a vested right to a building permit under those circumstances because the locality has no discretion to deny a building permit that complies with all lawful requirements.

The Eleventh Circuit has also repeatedly endorsed and applied those principles. In such decisions as <u>Southern Coop. Dev. Fund v. Driggers</u>, 696 F.2d 1347, 1352 (11th Cir.), <u>cert. denied</u>, 463 U.S. 1208 (1983), and <u>National Adver. Co. v. City of Fort Lauderdale</u>, <u>supra</u>, the Circuit Court uniformly has held that an applicant for a building permit has a vested right under Florida law to that permit if the application complies with all lawful zoning requirements in effect when the application is filed.

Other federal courts follow the same rule. For example, in <u>Carter v. City of Salina</u>, 773 F.2d 251, 252 (10th Cir. 1985), property owners sought to maintain a restaurant upon property that was zoned "residential". Because the court declared the municipality's zoning ordinance unconstitutional, the property owners were entitled to injunctive relief allowing them to maintain a restaurant as though the ordinance did not exist. The court held:

> If the zoning ordinance is void . . .
> [because of some constitutional defect], the
> properties are unzoned and the property
> owners may proceed with any other lawfully
> intended use.

<u>Id.</u> at 255. <u>Accord Lovell v. City of Griffin</u>, 303 U.S. 444, 452 (1938) ("As the ordinance is void on its face, it was not

22

necessary for appellant to seek a permit under it."); <u>Appeal of</u>
<u>FPA Corp.</u>, 360 A.2d 851, 853 (Pa. Commw. Ct. 1976) ("application
to use land contrary to unconstitutional zoning regulations may
not be denied ... on the ground that the municipality has
subsequently cured the objectionable feature of its
regulations"). The Florida appellate courts have noted, "A late
arriving owner is no less affected by the enforcement of a void
(nonexistent) ordinance than had he been present a lifetime. He
is being denied the right to use his property in a way permitted
by all legal city restrictions." <u>Bhoola v. City of Saint</u>
<u>Augustine Beach</u>, 588 So. 2d 666, 667 (Fla. Dist. Ct. App. 1991).

As the attached opinion of the Eleventh Circuit in the Fort
Lauderdale litigation reveals, the Circuit Court continues to
follow Florida decisions in this regard. Moreover, in the few
years since the Fort Lauderdale litigation was decided, there has
been no essential change in the Circuit Court's view of the First
Amendment as it applies in sign litigation. <u>Southlake Property</u>
<u>Assocs., Ltd. v. City of Morrow, Ga.</u>, 112 F.3d 1114, 1119 (11th
Cir. 1997), <u>cert. denied.</u>, 119 S. Ct. 60 (1998), is clearly
distinguishable because the Court expressly refused to reach the
constitutional issue in that case. The ordinance involved had
been applied by the municipality in a manner which left no doubt
that <u>all</u> non-commercial speech was regarded as on-site, <u>id.</u> at
1119, a far cry from Wilton Manors' enactment which clearly
treats various forms of non-commercial speech as off-premise.

While the Wilton Manors' sign ordinance, in Sec. II-3 (P),
prohibits erection of off-premises signs, there is no indication
of <u>any</u> intention by the city to limit the sweep of the ⸺

23

Ordinance's blanket prohibition of off-premises advertising to commercial advertising only. To the contrary, non-commercial as well as commercial speech is covered and expressly limited, witness Sec. II-5(4) dealing with temporary political signs.

In the <u>Metromedia</u> litigation, the California Supreme Court was invited by the U.S. Supreme Court to interpret the prohibitions of the San Diego statute upon the remand as applicable only to off-premise commercial speech. It found itself unable to do so because of the wording of that statute. In <u>Metromedia, Inc. v. City of San Diego</u>, 649 P.2d 902, 907 (Cal. 1982) the court had declared:

> Although the term "advertising" may imply a commercial message, it is not, in ordinary usage, limited to such message. "Advertising" is simply 'the action of calling something. . . to the attention of the public.'. . . Thus, in common usage a billboard bearing a political or even a personal message would be considered an "advertising display sign."

649 P.2d at 907 (citation omitted).

Indeed, even if the effects of Wilton Manors' blanket prohibition of off-premise outdoor advertising <u>were</u> limited to commercial speech, it is questionable whether the ordinance could constitutionally allow local officials to make the standardless determination of what constitutes "commercial" or "non-commercial" speech. Commercial advertisers who recast their messages in ideological terms can very easily obscure the line between commercial and non-commercial speech. Advertisers of any good or service could, as a consumer service, compare their performance and prices with those of the competition, as well as debate the comparative effects of their products on the

24

environment, the worker, the consumer lifestyle or the economy.
The Supreme Court has admitted that the line between the two
varieties of speech is hazy even now.  In Discovery Network
Justice Stevens wrote:

> We note that because Cincinnati's regulatory scheme
> depends on a governmental determination as to whether a
> particular publication is a "commercial handbill" or a
> "newspaper," it raises some of the same concerns as the
> newsrack ordinance struck down in Lakewood v. Plain
> Dealer Publishing Co. . . . the responsibility for
> distinguishing between the two carries with it the
> potential for invidious discrimination of disfavored
> subjects.  See also Metromedia, Inc.v. San Diego . . .
> (Brennan, J. concurring in judgment) (ordinance which
> permits governmental unit to determine, in the first
> instance, whether speech is commercial or
> noncommercial, "entail[s] a substantial exercise of
> discretion by a city's official" and therefore
> "presents a real danger of curtailing noncommercial
> speech in the guise of regulating commercial speech").

507 U.S. at 423, n. 19 (citations omitted)

M.D.C.

0000335



# DO NOT PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

OCT 26 1993

MIGUEL J. CORTEZ
CLERK

No. 92-4750

D. C. Docket No. 88-6851-CIV-WJZ

NATIONAL ADVERTISING COMPANY,

Plaintiff-Appellant,

versus

THE CITY OF FORT LAUDERDALE,

Defendant-Appellee.

SERVED

FILED

OBTAINED

DIARY

Appeal from the United States District Court
for the Southern District of Florida

(October 26, 1993)

Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior
Circuit Judge.

## PER CURIAM:

This case asks if plaintiff acquired vested rights in permits
to erect billboards. The district court entered a declaratory
judgment against plaintiff and denied injunctive relief. We
reverse in part and affirm in part.

In 1988, National Advertising Company ("National"), a



EXHIBIT

A

0000336

billboard company that wanted to erect billboards in Fort Lauderdale, sued the City of Fort Lauderdale ("the City") for declaratory judgment and injunctive relief. See National Ad. Co. v. City of Fort Lauderdale, 934 F.2d 283 (11th Cir. 1991) ("National I"). National alleged that the municipal ordinance governing signs, Fort Lauderdale Code § 47-50 (1974), violated the First Amendment because it treated commercial and non-commercial speech differently.

Shortly after filing suit, National applied for several permits to build billboards. The City rejected the applications because the sign ordinance banned all billboards. National sought review with the City's Board of Adjustment, which treated the request as an application for a zoning variance.

While the variance application was pending, the City amended the sign ordinance. The new sign ordinance also banned all billboards, but the amendments deleted the allegedly

2

unconstitutional sections.[1]  The Board then denied review of the earlier decision to deny permits.

The district court dismissed <u>National I</u> on the basis that the new sign ordinance made the case moot.  We reversed and remanded.  <u>National I</u>, 934 F.2d at 286.

On remand, the district court decided that the old sign ordinance unconstitutionally differentiated between commercial and non-commercial speech.  Because the content-based provisions were unseverable from the rest of the ordinance, the district court entered judgment declaring that the old sign ordinance was <u>wholly</u> unconstitutional.[2]  The district court also held that the old sign ordinance gave National no vested rights.  And, the district court refused to enjoin enforcement of the sign

_____

[1]We compared the old and new sign ordinances in detail in our earlier opinion.  <u>See</u> 934 F.2d at 284-85.

[2]The question of whether the ordinance was wholly unconstitutional or whether parts of it could be saved on a theory of severability was not raised in this appeal and is therefore not before us.

3

ordinance because the City was unlikely to reenact the old, unconstitutional sign ordinance and no party had challenged the new one.  National appeals.

## I.  Vested Rights

National argues that it acquired vested rights in sign permits because, when National submitted its permit applications, no valid law banned billboards.  We review this state law issue de novo.  Salve Regina College v. Russell, 111 S.Ct. 1217, 1222-24 (1991).

When a party submits an application that satisfies all existing and pending laws, the municipality lacks authority to deny the permit.  See Smith v. City of Clearwater, 383 So.2d 681, 688-89 (Fla. Dist. Ct. App. 1980).  When National applied for a permit, the only law that banned billboards was the old, unconstitutional sign ordinance.  An unconstitutional law cannot

**4**

support the denial of a permit application because such a law "is not voidable -- it is void. . . . It is as though the ordinance does not exist."[3] Bhoola v. City of St. Augustine Beach, 588 So. 2d 666, 667 (Fla. Dist. Ct. App. 1991); see Josephson v. Autrey, 96 So. 2d 784, 789 (Fla. 1957) (en banc) (unconstitutional law "can have no effect whatsoever"). Because no valid law banned billboards when the permits were applied for, the permits should have issued. Cf. Harris v. State, 31 So.2d 264, 266 (Fla. 1947) (where old law barred liquor license but was later held invalid, and new law barring license was not passed until after application was submitted, license must issue); Littlefield v. City of Afton, 785 F.2d 596, 602 (8th Cir. 1986) (property interest in permit existed because application "complied with all the legal

----

[3]That the City might have banned all billboards by using a different and, therefore, lawful ordinance does not change the fact that the ordinance used by the City was unconstitutional and a nullity. And, National's rights to use its property are not controlled by the City's intentions for prohibiting billboards. The City either had a valid ordinance or it did not. And when National applied for permits and the City denied the permits, the City had no valid prohibiting ordinance.

5

requirements").

The City argues that, even if National were entitled to permits under the old sign ordinance, the City could rely on the new sign ordinance to deny National's application. We disagree. When an application for a permit satisfies all existing and pending laws, the permit must then issue: a new law passed after the application was filed has no effect on the matter of issuance. See, e.g., Broach v. Young, 100 So.2d 411, 411 (Fla. 1958) (per curiam); Aiken v. E.B. Davis, Inc., 143 So. 658, 658 (Fla. 1932); Smith, 383 So.2d at 688; Southern Coop. Dev. Fund v. Driggers, 696 F.2d 1347, 1354 (11th Cir. 1983). The rule is the same when the existing law purportedly prohibits the desired use, but the existing law is later declared unconstitutional. Cf. Harris, 31 So.2d at 266 (discussing denial of liquor license application); City of Margate v. Amoco Oil Co., 546 So.2d 1091, 1094 (Fla. Dist. Ct. App. 1989) (where city illegally denied permit under old law, new law passed after

6

application was denied has no effect). The new sign ordinance had no effect on National's rights to have permits issued.[4]

The City says that National acquired no vested rights to the permits or to their use because National has shown no reliance on the state of the law before the adoption of the new ordinance. Absent reliance, a landowner generally has no right to existing zoning; the municipality can apply a new law to deny a use that was legal under an old law, unless the owner has relied (usually by spending money) on the old law. See, e.g., City of Gainesville v. Cone, 365 So.2d 737, 739 (Fla. Dist. Ct. App. 1978). But when a municipality unlawfully denies an application for a building permit, the applicant is deprived of a fair chance to rely on existing law. Where the municipality has wrongfully denied an application -- thus wrongfully denying the

---

[4]The City argues the new sign ordinance is a "technical" amendment that can be applied retroactively. We disagree because the new sign ordinance changes National's substantive rights. See Tsavaras v. Lelekis, 246 So.2d 789, 790 (Fla. Dist. Ct. App. 1971); City Council v. Trebor Constr. Corp., 296 So.2d 490 (Fla. 1974).

7

applicant a chance to rely on the law then existing -- requiring a showing of reliance would allow the municipality to gain an advantage from its own wrongful act. See Smith, 383 So.2d at 688; cf. Driggers, 696 F.2d at 1354 ("It would...be inequitable to permit the defendants to take advantage of a new law enacted while an application...valid when filed, has been unlawfully delayed."). This result would not be right. The City cannot advance the new sign ordinance to deny National permits and their use, even though National has shown no tangible reliance, in the customary sense, on the invalidity of the old sign ordinance. See Smith, 383 So.2d at 688.

The City relies mainly on two cases, City of Boynton Beach v. Carroll, 272 So.2d 171, 172 (Fla. Dist. Ct. App. 1973), and City of Hollywood v. Hollywood Beach Hotel Co., 283 So.2d 867, 869 (Fla. Dist. Ct. App. 1973), rev'd in part on other grounds, 329 So.2d 10 (Fla. 1976), to say that an application for a building permit creates no vested rights unless the

8

applicant shows reliance.    The City's cases are materially different from this case.  In City of Hollywood, the landowner obtained a building permit but, despite substantial preliminary expenditures, never began construction. and eventually surrendered the permit to the city.  The city then changed the zoning ordinance.   On these facts, the court held that the landowner had relinquished its vested rights under the building permit and under the old zoning ordinance.  Id. at 870.  But here, no permit was issued, much less "voluntarily relinquished."

In City of Boynton Beach, the landowner made no application for a building permit until the city had already issued a public notice stating its intent to ban by ordinance the use for which the landowner sought a permit. The court concluded that the landowner had no vested right to a permit.  Id. at 173.

In City of Boynton Beach, if the city had issued a permit to the landowner, the landowner could not have relied in good faith on the permit (and thus obtained vested rights) because the

**9**

landowner knew when he applied for the permits that the city was about to outlaw his desired use by a lawful ordinance. Cf. Sharrow v. City of Dania, 83 So. 2d 274, 275 (Fla. 1955). That the new ordinance was pending when the landowner applied was fatal to the landowner's rights under Florida law.

Here, when National applied for a permit, no ordinance prohibited billboards (the earlier sign ordinance was a nullity) and no new ordinance banning all billboards had been announced.[9] Unlike the situation in Boynton Beach, where a new ordinance was pending when the application was submitted, a legal vacuum existed in our case: the old sign ordinance was invalid and no new sign ordinance had yet been publicly proposed. If, at this point, the City had issued the permits to National, National could have immediately relied on the permits — expended funds and incurred obligations — to begin building

_____

[9]In this case that the City's old ordinance attempted unsuccessfully to prohibit billboards did not put National on notice that the City would necessarily attempt to prohibit billboards with another ordinance at some point in the future.

**10**

billboards.  By doing these acts, National could have gained protection from the effects of the later zoning law change. National's lack of demonstrable reliance on the invalidity of the old sign ordinance is not fatal to National's rights because the City's wrongful act of refusing to issue the permits denied National a fair chance to rely.

## II.  Injunction

National also argues the district court erred in refusing to enjoin enforcement of the old, unconstitutional sign ordinance. We review for abuse of discretion. Securities & Exch. Comm'n. v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982).

An injunction is proper where the unlawful conduct is likely to recur. See, e.g., United States v. Oregon State Medical Soc., 72 S.Ct. 690, 695 (1952); Meltzer v. Board of Pub. Instr., 548 F.2d 559, 567 n.13 (5th Cir. 1977), modified in part on other

11

grounds, 577 F.2d 311 (1978) (en banc). The district court should be skeptical of "protestations of repentance and reform, especially when abandonment seems timed to anticipate suit and there is probability of resumption." Oregon State, 72 S.Ct. at 696; see, e.g., Meltzer, 548 F.2d at 567 n.13; NAACP v. Evergreen, 693 F.2d 1367, 1370 (11th Cir. 1982). But denial of injunctive relief is proper where the record shows no reason to believe the unlawful conduct will resume. See United States v. W.T. Grant Co., 73 S.Ct. 894, 897 (1953).

At oral argument before the district court, the City said it "would be willing to agree" not to reenact the old ordinance. Nothing in the record suggests that the City's statement was made in bad faith or that the City will reenact the unconstitutional ordinance. The district court did not abuse its discretion in denying an injunction.[8]

---

[8] National cites National Ad. Co. v. Town of Babylon, 900 F.2d 551 (2d Cir. 1990), to argue that an injunction was necessary, despite the repeal of the old sign ordinance. But Babylon is unhelpful because that case did not discuss whether an injunction was the proper remedy.

12

NO. 5721    P. 14

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

Also, National argues that, to protect National's vested rights, the district court should have issued an injunction directing the City to issue National a permit following the City's "usual and customary processes." Because of its ruling on vested rights, the district court never considered whether an injunction was the proper remedy. We thus limit ourselves to reversing the district court's decision on vested rights and remanding for proper relief.

**13**

0000348

# RUTLEDGE, ECENIA, PURNELL & HOFFMAN

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

STEPHEN A. ECENIA
JOHN R. ELLIS
KENNETH A. HOFFMAN
THOMAS W. KONRAD
MICHAEL G. MAIDA
J. STEPHEN MENTON
R. DAVID PRESCOTT
HAROLD F. X. PURNELL
GARY R. RUTLEDGE

POST OFFICE BOX 551, 32302-0551
215 SOUTH MONROE STREET, SUITE 420
TALLAHASSEE, FLORIDA 32301-1841

———

TELEPHONE (850) 681-6788
TELECOPIER (850) 681-6515

OF COUNSEL:
CHARLES F DUDLEY

GOVERNMENTAL CONSULTANTS
PATRICK R. MALOY
AMY J. YOUNG

December 29, 1999

Kerry L. Ezrol, Esquire
City Attorney
City of Wilton Manors
524 Northeast 21st Court
Wilton Manors, Florida 33305

RE:    Wilton Manors Off-Premise Sign Permit Applications

Dear Kerry:

This letter is written in furtherance to our recent telephone conversations concerning Street Information Systems, Inc.'s pending off-premise sign permit applications with the City of Wilton Manors. In this regard, I have previously forwarded to you an opnion letter of November 22, 1999 from Myron D. Cohen of Hunton & Williams, outlining the constitutional problems in Wilton Manors' sign ordinance.

I have been informed that you may believe that Wilton Manors' sign ordinance may withstand a challenge based on the recent decision in Adventure Outdoor Advertising, Inc. v. City of Pompano Beach, Fla. In this regard, I am enclosing an opinion letter dated December 22, 1999 from Myron Cohen analyzing Wilton Manors' sign ordinance with the Ft. Lauderdale and Pompano Beach litigation. Furthermore, I believe that the analysis regarding Wilton Manors' sign ordinance and that of Pompano Beach and Ft. Lauderdale is set forth in detail, including the fact that Judge Zloch was reversed on two occasions on these issues. I particularly call your attention to Mr. Cohen's analysis on pages 8 - 10.

In addition, I call your attention to the issues of potential monetary damages and attorneys' fees and costs to which the City of Wilton Manors may expose itself in attempting to defend its current sign ordinance. My client, as you know, has met with city officials on at least two occasions and has been forthcoming in trying to reach an amicable resolution regarding the applications submitted. To date, we have not received any clear indication as to whether or not compromise may be achieved. If it is the city's position that it will not compromise and that it maintains that its



**EXHIBIT**

E

RUTLEDGE, ECENIA, PURNELL & HOFFMAN

Page 2
December 29, 1999

current ordinance is valid and not subject to a possible successful challenge, then of course my client will pursue all legal means necessary to obtain a determination of the unconstitutionality of the city's ordinance, and to seek issuance of all permits applied for as well as any monetary damages, attorneys' fees and costs.

Thank you for your review and consideration of this additional information. Upon your receipt and review of same, please contact me to discuss further. In the meantime, I also request that you circulate this information to the mayor, members of the council, city manager, and community services director for their review and consideration.

Sincerely,

Gary R. Rutledge

GRR/zr
enclosure

HUNTON & WILLIAMS

200 PARK AVENUE

NEW YORK, NEW YORK 10166-0136

TELEPHONE: 212-309-1000

TELECOPIER: 212-309-1100

December 22, 1999

751 EAST BYRD STREET
RICHMOND, VIRGINIA

1900 K STREET, N W
WASHINGTON, D C.

600 PEACHTREE STREET, N E.
ATLANTA, GEORGIA

101 SOUTH TRYON STREET
CHARLOTTE, NORTH CAROLINA

ONE HANNOVER SQUARE
RALEIGH, NORTH CAROLINA

900 SOUTH GAY STREET
KNOXVILLE, TENNESSEE

500 EAST MAIN STREET
NORFOLK, VIRGINIA

MYRON D. COHEN

AVENUE LOUISE 326
BRUSSELS, BELGIUM

60 LOMBARD STREET
LONDON, EC3V9CA

ULICA BAGATELA 14
WARSAW, POLAND

I TIM MEI AVENUE, CENTRAL
HONG KONG

990 RAMA IV ROAD
BANGKOK, THAILAND

201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA

1751 PINNACLE DRIVE
McLEAN, VIRGINIA

DIRECT DIAL: (212) 309-1020
FILE: 55626.5

Mr. Daniel Hardin
President
Street Information Systems, Inc.
3100 West State Road 84
Suite 409
Fort Lauderdale, Fla. 33312

Dear Mr. Hardin:

As requested, I have examined District Judge Zloch's
November 16, 1999 opinion and order in Adventure Outdoor
Advertising, Inc. v. City of Pompano Beach, Fla. The short
answer is that it does not cause me to change the views expressed
in my November 22, 1999 opinion to you concerning the
constitutionality of the sign ordinance of Wilton Manors.

First, the plaintiff in that case misinterpreted the
scope of the Pompano Beach ordinance. As a result, Judge Zloch's
opinion does not address important issues. Second, and partly
because the plaintiff misframed the issues, Judge Zloch, who has
previously been reversed on this subject, made two significant
errors. First, Judge Zloch erred in his interpretation of the
Eleventh Circuit's decision in Southlake Property Assoc., Ltd. v.
City of Morrow, Georgia, 112 F.3d 1114 (11th Cir. 1997) cert.
denied, 119 S.Ct. 60 (1998). Second, his opinion failed to
consider the impact on Metromedia, Inc. v. City of San Diego, 453
U.S. 490 (1981) of the Supreme Court's later decision in City of
Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993), where
the Court declared that "Metromedia did not say . . . that San
Diego could distinguish between commercial and noncommercial
offsite billboards that cause the same aesthetic and safety
concerns." 507 U.S. at 425, n.16 (emphasis added). The Seventh
Circuit has recently agreed: "this footnote [i.e., footnote 26 in
Metromedia] is not dispositive in this case in light of the later
Discovery Network footnote implying that such an ordinance is
underinclusive unless sufficient evidence of a fit between the

0000290

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 2

distinction and the city's safety and aesthetics goals exists"
Lavey v. City of Two Rivers, 171 F.3d 1110, 1115 n.16.

It is my belief that neither the Pompano Beach sign
ordinance nor the Wilton Manors' ordinance satisfies the test of
"reasonable fitness". Each ordinance--even if construed to apply
only to commercial speech--fails because a ban limited to
commercial messages does not have a direct relationship to the
stated municipal interests in aesthetics and traffic safety. It
is irrational to conclude that simply changing the message on a
structure from offsite to onsite speech will alleviate the
concerns expressed.

    I.    The Plaintiff Made the Wrong Arguments

    In Adventure Outdoor Advertising, the plaintiff
incorrectly argued that the city's sign ordinance prohibited
noncommercial speech altogether by allowing only onsite
commercial advertising and disallowing all other forms of speech
to be placed on signs. Slip Op., at 7, n.6.  Judge Zloch, relying
upon dicta in footnote 26 of the plurality opinion of the Supreme
Court in Metromedia, concluded that the Pompano Beach ordinance,
considered solely as a ban on all offsite commercial signage,
passed constitutional muster. Id., 9, 11, 15.

    The plaintiff had also contended that the Pompano Beach
sign code favored commercial speech over noncommercial speech by
banning all noncommercial speech while allowing commercial on-
premise sign advertising. Judge Zloch's response to this
contention was that noncommercial speech was everywhere allowed:
the Eleventh Circuit Court of Appeals in Southlake had in his
view determined that "noncommercial speech is always onsite
because 'an idea is located wherever the idea is expressed.'" Id.
at 20-21.  For this reason, Judge Zloch also rejected an
additional contention by the plaintiff that the sign code was
content-based (and hence subject to the higher standard of
"strict scrutiny") because nonconforming examples of onsite
commercial speech existed in the city. Id. at 21.

    The plaintiff's arguments and Judge Zloch's decision
were wrong because the the Pompano Beach sign code did, in
fact, permit and regulate non-commercial signage.  The structure
of the Pompano Beach sign code simply does not lend itself to the

## HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 3

interpretation given it by them.  While in § 156.02(B) of the
Pompano Beach Sign Code, it is stated that "The primary intent of
this chapter is to regulate signs of a commercial nature intended
to be viewed from any public right-of-way", in fact the ordinance
nonetheless clearly means to--and does--regulate and limit the
usage of noncommercial signage, allowing such signage to exist
but only on a limited basis within the environs of the city.  Note
the authorization for temporary signs pertaining to concerts,
carnivals, or civic, philanthropic, or educational events
(section 156.10); non-permanent political signs on behalf of
candidates for public office or signs urging the passage or
defeat of any ballot measure (section 156.08); and temporary
banners pertaining to drives or events of civic, philanthropic,
educational, or religious organizations (section 156.18).
Additionally, the sign code makes explicit reference to other
noncommercial signage which would be allowed within the city
limits, i.e., signs containing information for the benefit of the
public such as, but not limited to, institutional names,
churches, and points of interest with insignia placed thereon by
civic organizations or churches (section 156.10);  city, county,
state, or federal flag, banner or insignia (section 156.13 (j);
commemorative plaques or emblems of recognized historical
agencies or fraternal orders, but only if nonprofit (section
156.13 (k); and informational signs (section 156.13 (o).

     To the extent that plaintiff's counsel in Adventure Outdoor
Advertising interpreted the Pompano Beach sign code as regulating
commercial speech only, he clearly erred.  Furthermore, his error
caused the district court to go astray.

### II.   The Restriction Was, In Fact, Content-Based

     The consequences of the plaintiff's error in making the
wrong argument are exposed by an examination of the caselaw
dealing with similar statutes.  It is noteworthy that in footnote
26 of Metromedia, the Supreme Court plurality had instructed the
California courts that they could uphold the San Diego ordinance
by construing it to apply only to commercial signs. The
California Supreme Court, upon the remand, found itself unable to
accept the suggestion because the structure of the San Diego
ordinance clearly prohibited such an interpretation. The
California Supreme Court, sitting en banc, in Metromedia, Inc. v.
City of San Diego, 649 P.2d 902, 909 (Cal. 1982), concluded that

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 4

the San Diego ordinance was void in its entirety, despite the
presence of a severability clause.

The San Diego ordinance spoke only in terms of
permitted and prohibited signs: only those signs that made
reference to messages related to the products sold or the
activities conducted at their locations were permitted. All
others, save for a limited number of enumerated exceptions, were
prohibited. Metromedia, 649 P.2d at 903.  The ordinance
authorized--"signs designating the name of the owner or occupant
of the premises . . . or identifying such premises; or signs
advertising goods manufactured or produced or services rendered
on the premises.  Id. at 905.  The ordinance expressly proscribed
any sign which--"advertises or otherwise directs attention to a
product, service or activity, event, person, institution, or
business . . . conducted, sold, manufactured, produced, or
offered elsewhere than on the premises where such sign is
located."  Id.  The court construed such an ordinance as intended
to prohibit all off-premises signs, including billboards,
containing both commercial and noncommercial messages.  Id. at
906-07.

The California Supreme Court pointed out that the
city's concern was with the structure, not the message. Id. at
906. The ordinance, as was the case with the sign code of Pompano
Beach, see section 156.02 (B), was intended to eliminate signs
which distracted pedestrians and which blighted the aesthetic
character of the city.  The ordinance sought as a consequence to
ban all structures except those advertising onsite displays. Id.
at 906-07.

To preserve the constitutionality of the ordinance
(according to the plurality's suggestion in the U.S. Supreme
Court) the California court stated that it would have had to
limit the scope of the San Diego ordinance to a prohibition of
commercial signs and no others (as Judge Zloch did in Adventure
Outdoor Advertising). It could not do so, said the court, because
this was a task for the legislature. To do so would have been
inconsistent with the language of the ordinance, from which the
court gleaned the intent of those enacting it. Id. at 906.

It was evident, said the court, that noncommercial
speech as well as commercial speech was intended to be affected,

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 5

and it pointed to an exception (similar to Pompano Beach's) for
temporary political campaign signs. Id. at 907. From this the
court concluded that the City had intended to include
noncommercial messages in its ban, and that severance would bring
about an ordinance quite different from that contemplated by the
legislature at the time of the original enactment.
          Similar reasoning led to the refusal of the Second
Circuit and the Supreme Court of Virginia to authorize severance
of the offending provisions of the ordinances held
unconstitutional by them in National Adver. Co. v. Town of
Babylon, 900 F.2d 551, 553 (2d Cir.), cert. denied, 490 U.S. 852
(1990); National Adver. Co. v. Town of Niagara, 942 F.2d 145, 146
(2d Cir. 1991); and Adams Outdoor Adver. Co. v. City of Newport
News, 373 S.E.2d 917, 927 n.5 (1988).

          In Metromedia, Town of Niagara, Adams Outdoor
Advertising and Town of Babylon, each of the municipalities sued
had dealt comprehensively with both commercial and noncommercial
speech: in each ordinance reviewed, a general prohibition of off-
premises signage was ameliorated by the allowance of certain
specified noncommercial subjects of speech. The holding of each
decision was that (1) the general prohibition of off-premises
signs amounted to a favoring of commercial onsite signage over
the claims of noncommercial speech and (2) the statutory
exceptions for various forms of noncommercial signage were not
content-neutral, in other words, the city was "picking and
choosing" the subjects of noncommercial speech it would allow to
be exhibited.

          In Town of Niagara, 942 F.2d at 146-147, 150 n.12, the
ordinance contained explicit exceptions for political signs;
historical and governmental signs; bulletin boards customarily
incident to places of worship, libraries, museums, schools, fire
companies and fraternal organizations; and signs of civic,
fraternal, church and veterans' organizations seeking to
publicize events conducted by their respective groups. (The Town
contended that the latter provision, in practice, had led its
zoning authorities in the past to issue permits generally for
off-premises noncommercial signage.)

          In Metromedia, 649 F.2d at 907, the San Diego ordinance
allowed for public interest signs depicting time, temperature or

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 6

news as well as political signs, religious symbols, emblems of
religious orders or historical societies.
        In Adams, 373 S.E.2d at 919-20, the ordinance exempted
signs included noncommercial signs containing information about
safety or directions; special event signs limited to civic or
cultural events; signs denoting the functions of religious or
nonprofit organizations; bulletin boards for places of worship
and political signs.

        In Town of Babylon, where the ordinances of several
towns were invalidated in their entirety, Babylon's sign
ordinance contained exceptions for political signs and signs
advertising events of nonprofit organizations; Freeport's
ordinance authorized exceptions for off-premises displays of
flags and emblems of political, civic, philanthropic, educational
and religious organizations; Hempstead's ordinance allowed
religious signs as well as informational signs displayed for the
safety of the public and political signs; Islip excepted
political signs and signs identifying a grand opening, parade,
festival, fund drive or similar occasion; and Oyster Bay's sign
ordinance allowed announcement signs when erected by a public or
semi-public agency, an eleemosynary organization or permitted
club and political signs.

        And while it can be argued that none of these decisions
involved a court whose authority would have been binding upon
Judge Zloch, that certainly cannot be said for the decision of
the Eleventh Circuit in National Adver. Co. v. City of Fort
Lauderdale, 934 F.2d 283 (11th Cir. 1991), a case I argued, which
is cited by Judge Zloch at page 8 of his opinion, involving an
ordinance in no substantial way dissimilar from that of Pompano
Beach's, and an ordinance which Judge Zloch, upon the remand from
his original decision, had himself found unconstitutional in its
entirety.

        The Fort Lauderdale statutory scheme had authorized
only business identification signs, directional signs, and
"point-of-purchase" signs, defined as "restricted to advertising
the primary purpose of the business operation located on the same
property." section 47-50.3(1). By virtue of section 47-5.13A(3),
no other kind of advertising sign of any type but that relating
to business was permitted save for a limited number of specific
exceptions for noncommercial speech set forth elsewhere in the

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 7

Fort Lauderdale sign ordinance. Moreover, the ban on off-premise
advertising was city-wide, as is the case with that of Pompano
Beach, not limited to a particular "historic district."  Only a
limited number of specific messages were exempted--and these were
exempted from the entire statutory scheme.

Section 47-50.9 of the Fort Lauderdale ordinance, for
example, declared:

> The following signs shall be exempt from the
> provisions of [the Fort Lauderdale Sign
> Ordinance]: flags. . . governmental pennants
> and signs. . . holiday decorations. . .
> memorial signs. . . [on-premise] bulletin
> boards (for medical, public, charitable or
> religious institutions. . . religious
> symbols. . . commemorative plaques of
> recognized historical agencies or
> identification emblems of religious orders or
> historical agencies

Additionally, section 47-50.6 of the ordinance authorized
political campaign signs.

While Judge Zloch found the Fort Lauderdale ordinance
unconstitutional and incapable of severance of the offending
provisions, he nonetheless denied the plaintiff relief. He
correctly noted that no rezoning ordinance was pending at the
time of National's application; nonetheless he sought to
distinguish Florida precedent on vested rights by claiming that
notice of a pending ordinance need not be given "where the
existing ordinance prohibited the activity in which the plaintiff
sought to engage."  The fundamental error committed by him lay in
the assumption that there was, in fact, an "existing ordinance."
The ordinance to which the court pointed has just been declared
by him void in its entirety. National's applications were filed
at a time when there was no valid sign ordinance in effect within
the city limits, and its rights could not be affected by what did
not exist. National appealed and once again Judge Zloch was
reversed.

During oral argument before the Eleventh Circuit on
June 4, 1993, Judge Hill had asked me whether Florida could state

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 8

that if a party was on notice of a city's "wishes" that would be
sufficient to preclude the establishment of vested rights.  I had
answered in the negative and pointed to Bhoola v. City of Saint
Augustine Beach, 588 So.2d 666 (Fla. Dist. Ct. App. 1991)[1]/ as
an example of how the Florida courts would react to this kind of
an argument.  Judge Hill asked the city's counsel, Ms. Lindsey
Payne, to comment on the Bhoola case, and she attempted to
distinguish it by stating that in that case, the city was
prohibited from relying upon the later-enacted amendment to its
zoning code because it had clearly failed to follow Florida's
statutory requirements for giving notice prior to seeking to
amend zoning ordinances.  Judge Hill responded that this was not
as grievous a sin as the failure to follow Federal constitutional
requirements in our case.  He commented, "You don't seem to be so
enamored of the Federal Constitution."

        Chief Judge Edmondson declared that it was not within
Florida's power to validate any portion of statutes held
unconstitutional under the federal Constitution. This was only in
part a state law issue.

        Judge Hill asked the city's counsel how the "revealed
but unacted wishes of the Florida City Council" could take away a
person's rights. When the city's counsel responded that the
federal constitution was not the issue here- that this was not a
"taking" case but a simple question of local real estate law-
Hill responded, "A lease is not property?".

        Judge Edmondson stated, "It is as if the federal courts
had said nothing in this case." As he understood the state law
of Florida, if there was no restriction at all on property and
the municipality wanted a $25 permit application fee, as long as
you tendered the fee, you would be entitled to the permit.
Counsel for the City then said that if nothing on the books
prohibited the granting of the permit, the city would have to
issue it. However, there was something on the books here, albeit

---

1/      In Bhoola, a Florida appellate court held that a landowner seeking to erect a hotel, which use was
barred by an amendment to the local zoning code, had standing to challenge the constitutionality of the
amendment even though he had purchased his property with full knowledge of the enactment. To hold
otherwise, said the court, would be to breathe life into a void ordinance.  588 So. 2d at 667.

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 9


it was included in an unconstitutional statute.  Edmondson then
remarked, "There is no building ordinance, right?" and Ms. Payne
admitted that this was so.

        Judge Edmonson then stated (and this is an exact
quotation): "In your case there was an ordinance in effect on the
books, but we have held that your ordinance is un-American, is
contrary to the heart and core of the American Constitution." He
went on to state that "If your presentation is right, the Civil
War never took place."  He then asked the City's counsel whether
or not it wasn't true that the Florida Supreme Court had never
been faced with this kind of situation before and she admitted
that that was so.  Nonetheless, it was the City's position that
billboards could be prohibited retroactively.

        The City settled with National Advertising Co.
following the second reversal of Judge Zloch in the case.  The
Fort Lauderdale decision has subsequently been followed by the
Eleventh Circuit in Dimmitt v. City of Clearwater, 985 F.2d 1565,
1568 (11th Cir. 1993), where the Circuit Court upheld a challenge
by an automobile dealer which had displayed 23 American flags in
violation of the city's sign code, which limited the number of
flags which could be flown on such property to two.  The two-flag
exemption, however, only applied if the flags "represent[ed] a
governmental unit or body" and as a consequence discriminated
against flags displaying, for example, the Greenpeace logo or a
union affiliation.  Id. at 1569.  The Eleventh Circuit, expressly
following its earlier decision in National Adver. Co. v. Fort
Lauderdale, upheld the standing of the applicant to assert the
First Amendment rights of those whose noncommercial speech was
affected by the ordinance. It found the ordinance
unconstitutional as a content-based regulation of noncommercial
speech. The court held:

                Solomon [v. City of Gainsville, 763 F.2d 1212
                (11th Cir. 1985)] and National Advertising
                illustrate that a municipality may not
                accomplish its purposes in promoting
                aesthetics and traffic safety by restricting
                speech depending upon the message expressed.

Id. at 1570.

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 10

The court also refused to rewrite the clear terms of the statute
in order to find a narrowed construction which might be
constitutional on the ground that to do so "would amount to . . .
interference with the state legislative process . . ." Id. at
1572.

III. Judge Zloch Erred In His Interpretation of
Southlake And In Failing To Address Discovery
Network.

The Circuit Court's decision in Southlake, supra, has
not changed established law in the Eleventh Circuit, nor had it
sought to do so. In that case, the lower court had found
constitutional a sign ordinance of the City of Morrow which
contained a prohibition of billboards. Relying upon Messer v.
City of Douglasville, Ga., 975 F.2d 1505 (11th Cir. 1992) cert.
denied, 508 S.Ct. 930 (1993), the District Court had held that
the prohibition of offsite signage (which the lower court had
determined barred not only commercial but noncommercial speech)
was constitutionally permissible.  On appeal, the Eleventh
Circuit had rejected such a broad interpretation of Messer,
pointing out that the restriction upon all offsite signage in
that case was limited to the historic district of the city, a
significant factor in its decision. Id. at 1117 n.6.

The Circuit Court in any event refused to validate the
lower court's finding that the Morrow sign ordinance was intended
to affect noncommercial speech. The court declared:

Morrow maintains: The City has never
interpreted its ordinance to disallow
noncommercial speech. Further, the City's
[sic] has documented a three-year history of
permitting noncommercial off-premise messages
to be posted on commercial properties
throughout the City.
.   .   .   .

As Morrow itself concedes, the ordinance's
definition of billboard is ambiguous. In
evaluating this facial challenge to the
ordinance, we must construe the ambiguity, if
possible, in a manner which avoids any

## HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 11


> constitutional problems.  In so doing, we
> must consider Morrow's own authoritative
> construction of the ordinance, including its
> implementation and interpretation.

Id. at 1117, 1119 (citations omitted).

        The Circuit Court accepted Morrow's construction of its
sign code to avoid the constitutional problems it was required to
address in cases such as National Adver. v. Fort Lauderdale. Its
statement that off-premises speech "is always onsite" must be
limited to the facts of that case. Indeed, the Circuit court
itself pointed out:

> Of course, should Morrow reinterpret its
> ordinance to prohibit noncommercial signage,
> this would present a different case.

112 F.3d at 1119 n.11.

        Most significantly, the Southlake court was never asked to
examine the Morrow ordinance pursuant to each of the elements set
forth by the Supreme Court for evaluating the constitutionality
of regulations involving commercial speech, as mandated by
Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n., 447
U.S. 557, 563-66 (1980).  The plaintiff in Southlake limited his
argument to a clam that Morrow's ordinance failed only the second
prong of the Central Hudson test (i.e., the ordinance must seek
to implement a substantial governmental interest), alleging that
the ordinance was silent as to its purposes. The Circuit Court,
however, credited the city's defense, to wit, that a Statement of
Findings in the ordinance had in fact recited Morrow's
significant interest in traffic safety and aesthetics. As a
consequence of the plaintiff's failure to raise any other prong
of the Central Hudson test, the Eleventh Circuit never considered
the applicability of Discovery Network and its mandate that
restrictions on commercial speech cannot be upheld if they do not
advance the government's asserted interest in enacting them nor
whether less restrictive means were available.  The Circuit Court
expressly noted:

> Southlake does not raise on appeal any
> challenge to the ordinance based on the other

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 12

> three <u>Central Hudson</u> factors [<u>i.e.</u>, (1) that
> it concerns lawful activity and is not
> misleading; (3) directly advances that
> interest; and (4) reaches no further than
> necessary to accomplish the given objective.]

<u>Id.</u> at 116 n.5.

Selective prohibitions on expression must themselves
pass constitutional muster. <u>See</u> <u>Latino Officers Assoc. v. City
of New York</u>, No. 99-7657, 1999 U.S. App. LEXIS 29970, at *22 (2d
Cir. Nov. 17, 1999). As the 11th Circuit stated in <u>Sciarrino v.
City of Key West, Fla.</u>, 83 F.3d 364, 368 (11th Cir. 1996), <u>cert.
denied</u> 519 U.S. 1092 (1997), "Restrictions on commercial speech
must not only address a valid problem, but also must contribute
effectively to the solution-- this is the 'direct advancement'
element of the <u>Central Hudson</u> test. The focus in this stage of
our study is on whether the evidence supports the idea that the
regulation will actually work. See <u>Edenfield</u>, 507 U.S. at 771,
113 S.Ct. at 1800 (party seeking to justify commercial speech
restriction must prove that 'the harms it recites are real and
that its restriction will in fact alleviate them to a material
degree')..."

The Circuit Court in <u>Southlake</u> was not asked to
consider whether the city could legitimately advance its interest
in aesthetics or traffic safety by regulating the content of the
wording on identical structures to prohibit only those
advertisements that concerned themselves with off-premise
activities. Nor was the court asked whether less restrictive
means could have accomplished the city's purported goals, such as
limiting all signage per lot, size or location without addressing
sign content. These are certainly issues present in any
consideration of the Wilton Manors sign ordinance which we would
raise in a judicial challenge.

In <u>Adventure Outdoor Advertising, Inc. v. Pompano
Beach</u>, Judge Zloch never addressed the issues raised by <u>Discovery
Network</u> (although the decision was cited at page 9 of the slip
opinion). Nor was he given much aid by plaintiff, who contended
that the ordinance did not advance the city's professed interest
in aesthetics only because existing signs in the city were
"aesthetically more offensive" than "professionally constructed

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 13

and maintained billboards" would be. Nor did the plaintiff
challenge the series of exemptions for noncommercial speech
contained in the sign code. Slip Op. at 7 n.5. Furthermore,
because of a default by plaintiff, the judge never ruled on the
issue of whether Section 156.11(8) of the sign code was
unconstitutional because it prohibited messages of an "obscene,
indecent or immoral nature". Slip Op. at 25.

<u>CONCLUSION</u>

As a consequence of the foregoing, and for the reasons
expressed in my opinion letter of November 22, 1999 with its
accompanying memorandum, I believe your organization should take
whatever action you deem necessary to obtain judicial validation
for the permits sought. The Wilton Manors sign ordinance is
essentially identical to that of the ordinance challenged
successfully in the <u>Fort Lauderdale</u> litigation. If that case is
good law in the Eleventh Circuit, the same result should follow.

Apart from the likelihood of obtaining a favorable
result, in light of the Supreme Court's landmark decision this
September in <u>City of Monterey v. Del Monte Dunes at Monterey,
Ltd.</u>, 119 S.Ct. 1624 (1999), a successful result could also lead
to a separate lawsuit against the City to recover damages for a
temporary regulatory taking of your organization's property
interest during the period while the city barred the erection of
your requested signage. The Court has now held that a property
owner asserting a takings claim in an action under 42 U.S.C.
section 1983 has a Seventh Amendment right to a jury trial and
damages where it is claimed that a land use decision has not
substantially advanced a legitimate government interest. <u>Id.</u> at

HUNTON & WILLIAMS

Daniel L. Hardin, President
Street Information Systems, Inc.
December 22, 1999
Page 14


1638-40.[2/] Furthermore, a holding directing the City to grant
your applications should be followed by a motion before the
federal district court for counsel fees incurred in prosecuting
the action. (In National Advertising's action in the Town of
Babylon litigation, National was awarded counsel fees in the
amount of $300,000 by the district court. The award was affirmed
by the Second Circuit on appeal, and the defendants paid in
full).

Sincerely,

Myron D. Cohen

MDC:jj


---

[2/]    Given the number of billboards in Florida, such a calculation would not lend itself to charges that it
was too speculative for enforcement. See, e.g., Van Wagner Adver. Corp. v. S & M Enters., 492 N.E.2d 756,
761-62 (1986), where New York's highest court authorized a damage award for a
sign company lessee for breach of a lease for advertising space on the exterior wall of a building. The court
stated that damages should have been awarded for the duration of the lease contract, declaring:

> First, it is hardly novel in the law for damages to be projected into the
> future. Particularly where the value of commercial billboard space can be
> readily determined by comparisons with similar uses-- Van Wagner itself has
> more than 400 leases-- the value of this property between 1985 and 1992
> cannot be regarded as speculative.

492 N.E.2d at 760-61 (emphasis added).



# *A G E N D A*

Welcome To Your City Council Meeting

Your Comments Are Encouraged During
The Hearing From The Public And During
Any Scheduled Public Hearing

## REGULAR CITY COUNCIL MEETING
## TUESDAY, JANUARY 25, 2000
## 7:30 P.M. - COUNCIL CHAMBERS

1.  CALL TO ORDER
    Invocation
    Pledge of Allegiance

2.  ROLL CALL

3.  INTRODUCTION OF GUESTS - VICE MAYOR FIORE

4.  PROCLAMATIONS

    a. Election Day Proclamation

5.  PRESENTATIONS

    Presentation by: Mayor Seiler
    To: Officer Oscar Gonzalez
    (Officer of the Quarter)

    Presentation by: Mayor Seiler
    To: Kim Gerardi
    (Civilian Service Award)

6.  **PUBLIC HEARING:**

    RE: Submission of a Grant
    Application in the Amount of $128,700
    to Broward County Community Development
    Division For 26th Year Funding Through the
    Community Development Block Grant Program.



**EXHIBIT**

F

7.    HEARING FROM THE PUBLIC
      Any member of the Public may Speak on any issue.

8.    CONSENT AGENDA

Items listed under Consent Agenda, Item 7 are viewed to be routine and the recommendation will be enacted by ONE MOTION in the form listed below.    If discussion is desired, then the item(s) will be removed from the Consent Agenda and will be considered separately.

   a. Motion to Approve Travel Authorization Request for:

      None

   b. Motion to Approve Minutes for:

      1.  Regular City Council Meeting  11/9/99

      2.  Regular City Council Meeting 11/23/99

   c. Motion to Approve Bills Submitted by:

      1.  The Tamara Peacock Company
          Invoice No. 99272 - Dated 12/10/99-----------------------$5,440.50

      2.  The Tamara Peacock Company
          Invoice No. 99230 - Dated 10/21/99------------------------$2,295.00

      3.  The Tamara Peacock Company
          Invoice No. 99277 - Dated 12/10/99-----------------------$    85.41

      4.  Request from St. Clement Church - for the Annual Family
          Festival - on February 24th, 25th, 26th and 27th

9.    PUBLIC HEARINGS (Ordinances Second Reading)

          NONE

10.    ORDINANCES (First Reading)

a. **ORDINANCE NO. Z-212:**

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, AMENDING ARTICLE 11 OF THE ZONING ORDINANCE OF THE CITY OF WILTON MANORS TILTED "SIGNS"; PROVIDING FOR THE PROMOTION OF AESTHETICS AND TRAFFIC SAFETY FOR THE PLACEMENT OF SIGNS; PROVIDING PROTECTION FOR NONCOMMERCIAL SIGNS TO BE ERECTED; DELETING SECTION 11-5(C ), ENTITLED "TEMPORARY POLITICAL SIGNS," IN ITS ENTIRETY; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; PROVIDING FOR INCLUSION; PROVIDING FOR AN EFFECTIVE DATE.
**(TABLED FROM REGULAR CITY COUNCIL MEETING OF 1/11/2000)**


b. **ORDINANCE 804:**

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, AMENDING ORDINANCE NO. 802 TO REFLECT MONEY RESERVED AND CARRIED OVER FROM THE FISCAL YEAR 1998/99 BUDGET; PROVIDING FOR SEVERABILITY; PROVIDING FOR CONFLICTS; AND PROVIDING FOR AN EFFECTIVE DATE.

c. **ORDINANCE 805:**

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, AMENDING ORDINANCE NO. 788, WHICH ORDINANCE APPROPRIATED FUNDS TO EACH DEPARTMENT FOR THE FISCAL YEAR 1998/99; PROVIDING FOR SEVERABILITY; PROVIDING FOR CONFLICTS; AND PROVIDING FOR AN EFFECTIVE DATE.

11. RESOLUTIONS

a. **RESOLUTION NO. 2309:**

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, SUPPORTING A PROPOSED LOCAL DELEGATION SPECIAL ACT PROHIBITING THE SALE, OFFER, LOAN, POSSESSION OR DISPLAY FOR SALE, TRANSFER OR ACQUISITION OF ANY ASSAULT WEAPONS WITHIN BROWARD COUNTY, FLORIDA; DIRECTING THE CITY CLERK TO TRANSMIT A COPY OF THIS RESOLUTION TO OTHER INTERESTED CITIES AND GOVERNMENTAL AGENCIES WITHIN BROWARD COUNTY; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; AND PROVIDING AN EFFECTIVE DATE.

b. **RESOLUTION NO. 2310:**

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, APPROVING AND AUTHORIZING THE PROPER CITY OFFICIALS OF THE CITY OF WILTON MANORS TO EXECUTE A SECOND AMENDMENT TO THE AGREEMENT WITH BOB-RAY, INC. TO ERECT AND MAINTAIN BUS BENCHES IN PUBLIC RIGHT-OF-WAY; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; AND PROVIDING AN EFFECTIVE DATE.

c. **RESOLUTION NO. 2311:**

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, AUTHORIZING THE PROPER CITY OFFICIALS OF THE CITY OF WILTON MANORS TO EXECUTE A CORPORATE RESOLUTION AND CERTIFICATE OF INCUMBENCY (COMMERCIAL CREDIT CARD ACCOUNT) WITH SUNTRUST BANKCARD, N.A.; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; AND PROVIDING AN EFFECTIVE DATE.

d. **RESOLUTION NO. 2312:**

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA APPOINTING ONE (1) MEMBER TO THE COMMUNITY AFFAIRS ADVISORY BOARD TO FILL THE UNEXPIRED TERM OF MICHAEL R. WRIGHT; AND PROVIDING FOR AN EFFECTIVE DATE.

12.    UNFINISHED BUSINESS

      a. Proposed Letter of Agreement from
         William W. Aquila - Re: 2020 Building

13.    REPORTS FROM BOARDS AND ADMINISTRATIVE OFFICIALS

      a. City Manager's Report

      b. City Attorney's Report

14.    NEW BUSINESS

      a. Discussion:  RE:  Intent Resolution for Non-Ad Valorem
                      Assessment for Solid Waste Collection Disposal.

      b. Discussion:  RE:  Ordinance Pertaining to
         the Amendment of Chapter 2 of the Code
         of Ordinances as it Pertains to the Code Enforcement Board.

15.    SECOND HEARING FROM THE PUBLIC

16.    REPORTS FROM ELECTED OFFICIALS

17.    ADJOURNMENT

Pursuant to FS. 286.0105, if a person decides to appeal any decision made by the Board, Agency or Commission with respect to any matter considered at such meeting, or hearing, he will need a record of the proceedings and that for such purposes he may need to ensure that a verbatim record of the proceedings is made, which record includes the testimony and evidence upon which the appeal is based.

ANY PERSON REQUIRING AUXILIARY AIDS AND SERVICES FOR THE MEETING MAY CALL THE ADA COORDINATOR AT 390-2122 AT LEAST TWO WORKING DAYS PRIOR TO THE MEETING.  IF YOU ARE HEARING OR SPEECHIMPAIRED, PLEASE CONTACT THE FLORIDA RELAY SERVICE BY USING THE FOLLOWING PHONE NUMBERS: 1-800-995-8770 (VOICE) 1-800-955-8771 (tdd).

ORDINANCE NO. Z-212

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF WILTON MANORS, FLORIDA, AMENDING ARTICLE 11 OF THE ZONING ORDINANCE OF THE CITY OF WILTON MANORS, TITLED "SIGNS"; PROVIDING FOR THE PROMOTION OF AESTHETICS AND TRAFFIC SAFETY FOR THE PLACEMENT OF SIGNS; PROVIDING PROTECTION FOR NONCOMMERCIAL SIGNS TO BE ERECTED; DELETING SECTION 11-5(C), ENTITLED "TEMPORARY POLITICAL SIGNS," IN ITS ENTIRETY; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; PROVIDING FOR INCLUSION; PROVIDING FOR AN EFFECTIVE DATE

WHEREAS, the City Council, from time to time, reviews the Zoning Ordinance of the City of Wilton Manors and directs City staff to recommend certain changes to its provisions; and

WHEREAS, at City Council direction, staff has reviewed the Zoning Ordinance provisions relating to the regulation of signs within the City of Wilton Manors; and

WHEREAS, Article 11 was last amended in 1997; and

WHEREAS, the City is desirous of minimizing the visual blight and safety hazards associated with the placement of billboards and other off-premises signs within the community; and

WHEREAS, the City Council recognizes that the City's appearance has a direct affect on property values, tourism and the promotion of public safety, welfare, convenience and enjoyment of travel and the free flow of traffic within the City; and

CODING:    Words in struck through type are deletion from existing law;
Words in underscored type are additions

Page 1 of 4

H:\1992\920129.WM\ZINGORD\sign code amd1.doc
PJB|12/2/199 |rev4|4011200



EXHIBIT

G

1    WHEREAS, the City Council has determined it to be in the best interests of the

2    citizens of the City to amend Article 11 of the Zoning Ordinance of the City of Wilton

3    Manors:

4        NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE

5    CITY OF WILTON MANORS, FLORIDA:

6        Section 1.  That Article 11 of the Zoning Ordinance of the City of Wilton Manors

7    titled "Sign Regulations", is hereby amended to read as follows:

8                    ARTICLE 11.  SIGN REGULATIONS

10   11-1   PURPOSE

12       A.    The purpose of this Article is to permit signs that will not by their size,
13   location, construction or manner of display, endanger the health, safety and general welfare of
14   the public.

16       B.    To encourage signs that are architecturally compatible with the buildings upon
17   which they are placed.

19       C.    To facilitate and efficiently transfer information.

21       D.    To create an aesthetic and enjoyable appearance for city visitors and residents.

23       E.    To safeguard and enhance property values within the community.

25       F.    To preserve the beauty and unique character of the city.

27       G.    To promote pedestrian and traffic safety.

30   Any sign containing noncommercial copy shall be deemed an on-premises sign, and any sign
31   authorized in this article is allowed to contain noncommercial copy in lieu of any other copy.

33       Section 2.    That Section 11-5(B) of Article 11 of the Zoning Ordinance of the
34   City of Wilton Manors, titled "Schedule 3, Schedule of Requirements for Temporary Signs"

CODING:    Words in ~~struck through~~ type are deletion from
               existing law;
               Words in underscored type are additions

**Page 2 of 4**

H:\1992\920129.WM\ZINGORD\sign code amd1.doc
PJB\12/2/199 \revdjd01\800

is hereby amended to add an additional sixth Category to the five categories of temporary signs already contained therein, to read as follows:

6.     Category:     <u>Political Signs</u>

                 Number:            <u>Maximum of two signs per property</u>

                 Sign Area:          <u>Maximum area per sign: Thirty-two (32) square feet;</u>
<u>Maximum height per sign: Fifteen (15) feet;</u>
<u>Total area of all signs on one property;</u>
<u>One square foot per foot of street frontage, not to exceed one hundred (100) square feet per property.</u>

                 Time Period:       <u>Political signs, pertaining to a time, event purpose which is no longer imminent or pending shall be removed within seven days subsequent to said time or event.</u>

                 <u>Special Conditions:</u>    <u>N/A</u>

       <u>Section 3.</u> That Section 11-5(C) of Article 11 of the Zoning Ordinance of the City of Wilton Manors titled "Temporary Political Signs", is hereby repealed and deleted in its entirety.

       <u>Section 4.</u> Conflicts.

       All ordinances or parts of ordinances, resolutions or parts of resolutions in conflict herewith be and the same are hereby repealed to the extent of such conflict.

       <u>Section 5.</u> Severability.

   If any section, sentence, clause, or phrase of this ordinance is held to be invalid or unconstitutional by any court of competent jurisdiction, then said holding shall in no way affect the validity of the remaining portions of this ordinance.

CODING:     Words in ~~struck through~~ type are deletion from existing law;
                  Words in <u>underscored</u> type are additions

**Page 3 of 4**