UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

NIGHT BOX
FILED
CASE NO. 00-6186-CIV-UNGARO-BENAGES
SEP 1 8 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

WILTON MANORS STREET SYSTEMS,
INC.,

       Plaintiff,

vs.

CITY OF WILTON MANORS,

       Defendant.

_____/


**PLAINTIFF, WILTON MANORS STREET SYSTEMS, INC.'S RESPONSE
IN OPPOSITION TO DEFENDANT, CITY OF WILTON MANORS'
MOTION FOR SUMMARY JUDGMENT**


Pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 7.5, plaintiff, Wilton Manors Street

Systems, Inc. ("Street Systems" or "plaintiff"), submits the following memorandum of law and

statement of controverted material facts in opposition to the motion of defendant, the City of

Wilton Manors ("the City" or "Wilton Manors"), for summary judgment.

## MEMORANDUM OF LAW

**1.    Street Systems has vested rights to the issuance of the six permits.**

The basis of Street Systems' response to the City's motion for summary judgment is set

forth in Points 2 and 3 of its own motion for summary judgment, and is incorporated herein.[1]

Briefly, Street Systems distinguishes the City's precedents on mootness by reliance upon the

decision in National Adver. Co. v. City of Fort Lauderdale, 934 F.2d 283 (11th Cir. 1991)

("National I"), and the subsequent decision by the Court of Appeals in that case on

October 26, 1993 ("National II"), a copy of which is attached as part of Exhibit D) to the

Affidavit of Gary Rutledge filed on August 25, 2000 in support of Street Systems' motion for

summary judgment.

In National II, the Court of Appeals held that under Florida law the plaintiff, National

Advertising Company ("National"), had acquired vested rights in the sign permits it had applied

for because, when National had submitted its permit applications, no valid law banned

billboards.  The Court of Appeals stated: "When an application for a permit satisfies all existing

and pending laws, the permit must then issue; a new law passed after the application was filed

has no effect on the matter of issuance. (citations omitted).  The rule is the same when the

existing law purportedly prohibits the desired use, but the existing law is later declared

unconstitutional." (citations omitted). Slip opn. at 6.  In the case at bar, all permit applications

---

[1]  Point 2, commencing at page 11, is entitled "SIS' Challenge to the City's Sign Ordinance Was Not Rendered Moot by the Enactment of the Amendatory Sign Ordinance." Point 3, commencing at page 13, is entitled  "The Recent Amendments to the City's Sign Ordinance Fail to Cure Its Constitutional Invalidity."

were filed by Street Systems' predecessor in interest, Street Information Systems, Inc. ("SIS")[2/] at a time when no constitutionally valid sign ordinance was in effect in the City of Wilton Manors. As a consequence, this Court has authority to order the City to follow its usual and customary processes in issuing permits to Street Systems.

The district court upon the remand in National I (Judge Zloch) had decided that the old ordinance, in no way distinguishable in principle from the 1997 Wilton Manors Sign Ordinance, had unconstitutionally differentiated between commercial and noncommercial speech. Because the content-based provisions were unseverable from the rest of the ordinance, the district court had entered judgment declaring that the old sign ordinance was wholly unconstitutional. Judge Zloch had refused to enjoin enforcement of the sign ordinance, however, because he had concluded that the City of Ft. Lauderdale was unlikely to reenact the old, unconstitutional sign ordinance and no party had challenged the City's new sign ordinance.

The district court's failure to hold that National had secured vested rights as a result of its filing for permits when the old ordinance was in effect had occasioned the second appeal, leading to the holding in National II that National had indeed secured vested rights as a result of its filing for permits prior to amendment of the unconstitutional ordinance.

2.    **The unconstitutional provisions of the City's sign ordinance cannot be severed.**

While the principal contentions made by Wilton Manors to this Court in support of its motion for summary judgment were foreshadowed in plaintiff's own motion for summary

---

[2/]    Street Systems is the transferee of all right, title and interest in the applications filed by SIS, and has been substituted as plaintiff in place of SIS pursuant to the Order Granting Motion for Substitution of Party entered on August 18, 2000.

judgment, one contention is new and requires a response. The City, which makes no effort whatsoever to counter Street Systems' contentions with respect to the invalidity of the provisions of the 1997 sign ordinance challenged in this action, nonetheless requests this Court to sever all such challenged provisions leaving intact only "the remaining, effective portions of the ordinance." (City's memorandum of law, at 17.) For this proposition, the City relies upon the presence of a severability clause in the 1997 ordinance.

The presence of a severability clause is not, however, dispositive. See United States v. Jackson, 390 U.S. 570, 585 n.27, 88 S. Ct. 1209, 20 L.Ed.2d 138, 149 (1968) (the ultimate determination of severability will rarely turn on the presence or absence of a severability clause). As the Supreme Court stated in Reno v. ACLU, 521 U.S. 844, 884 n. 49, 117 S.Ct. 2329, 2351, 138 L.Ed. 2d 874, 906 (1997): "A severability clause is 'an aid merely; not an inexorable command.'"

The courts hold severance inappropriate when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended. National Adver. v. Town of Niagara, 942 F.2d 145, 148 (2d Cir. 1991) (finding sign ordinance unconstitutional and unsuited for severance because dissociating eleven provisions would leave large gaps in the ordinance, notwithstanding the general severance provision); see also In re New York State Superfund Coalition, Inc., 550 N.E. 2d 155, 157, 75 N.Y.2d 88, 94 (1989) (judicial excision is inappropriate where the potentially severed section is a core part of, and interwoven inextricably to, the entire regulatory scheme).

In the case at bar, the 1997 Wilton Manors sign ordinance was neither drafted nor enacted in separate "parts" which discretely banned commercial and noncommercial off-premise

signs, either of which might be stricken independently of the other. No part of the ordinance

alludes in any way to a substantive distinction between commercial and noncommercial

messages. Section II-4(G)(4) of the 1997 ordinance simply bans all off-premise signs. Nor can

such a substantive distinction be read into it without gratuitously supplementing the language

prohibiting off-premise signs with the phrase "except for off-premise signs bearing

noncommercial messages." Therefore, as this Court cannot say with certainty that the framers

envisioned Section 11-4(G)(4) as anything but a unitary "part" of the ordinance, the severability

clause avails the City nothing. Ackerly Commun. of Mass., Inc. v. City of Cambridge, 135 F.3d

210, 215-16 (1st Cir. 1998).[3]

      The real problem with the City's request for severance of the invalid provisions of the

1997 Wilton Manors sign ordinance is that the prohibitions on sign content found throughout the

ordinance would continue despite any judicial amendment of Section II-4(G)(4). When the sign

ordinance is read in its entirety, giving full force to all of its provisions, the ordinance both

allows and prohibits the noncommercial speech authorized by the proposed amendment. In other

words, the language that the City suggests would be a way of meeting the Metromedia standard

may be nullified by other provisions in the sign ordinance. Window signs, for example, have

copy expressly limited to the name of the commercial use and/or hours of operation (see Section

II-3(F)); copy on pole signs is limited to the name of the premises or use(s) of the property and

---

[3]  The First Circuit noted in Ackerly that if a court is unable to know whether the legislature
would have enacted a particular bill without the unconstitutional provision, it should not sever
the unconstitutional provision, but rather should strike the entire statute. 135 F.3d at 215.

generic words or symbols which describe products or services (see Section II-3(P)[4]; copy on temporary signs is limited to the uses permitted in the zoning district in which the property is located (see Section II-5(3)); all temporary signs which pertain to a time, event or purpose which is no longer imminent or pending must be immediately removed (see Section II-5(6)); temporary political signs require a cash bond, which may be forfeited if such signs are not removed within 15 days after termination of an election (see Section II-5(C)); decorations and festoons of light are limited to recognized holidays (see Section II-5(E)); accessory signs have copy limited to the uses permitted in the zoning district in which the property is located (see Section II-5.1(1)); signs on private property relating to the name of a neighborhood civic association are allowed but only if recognized by the city clerk as representing a neighborhood in the city or subdivision (see Section II-5.1(6)(b)); and Schedule 4, regulating the principal use of signs in the various districts, mandates only signs with copy limited to the name of the building or the main permitted uses for each street frontage.

Grafting language onto the body of this sign law would have effects not contemplated by its drafters. The same off-premise noncommercial signs the City would allow, through Section II-4(G)(4) if judicially amended, it would prohibit when the content based exemptions for on-premise signs are read. The ordinance becomes impossible to interpret as there are no clear standards for how it will be applied, i.e., it is not known what signs will be allowed and what

---

[4] The City incompletely quotes and thereby mischaracterizes Schedule 1, at page 16 of the City's memorandum of law in support of its motion for summary judgment. Omitted from the City's quotation of Schedule 1 ("Pole Sign Regulations") are the "Use" and "Special Conditions" columns which reflect that the City's regulations concerning height and area per side of pole signs, deal solely with on-premise signs; the City simply has no regulations concerning height and area per side of off-premise pole signs.

signs will be prohibited because of the sign's content. As the court noted in <u>Revere Nat. Corp.,</u> <u>Inc. v Prince George's County</u>, 819 F. Supp. 1336, 1346 (D. Md. 1993), "The County is caught between the rocks of incoherence and the shoals of constitutional standards it cannot meet."

In <u>National Adver. Co. v. Town of Niagara</u>, 942 F.2d 145 (2d Cir. 1991), the sign ordinance enacted by the Town of Niagara was essentially the same as that of Wilton Manors. It was a comprehensive measure which contained time, place and manner restrictions describing the permit process and the sizes and characteristics of the signs that were allowed, which regulated both commercial and noncommercial speech, and which barred with limited exceptions all off-premise advertising while authorizing commercial on premise signage. <u>Id</u>. at 146.  The district court held that the ordinance violated the First Amendment by elevating commercial speech over noncommercial speech and by impermissibly favoring certain types of noncommercial speech over others based on content. <u>Id</u>.  Nonetheless, the court, relying upon a severability clause similar to Wilton Manors', upheld certain provisions of the ordinance that it believed did not violate the First Amendment, including a section covering time limitations, location, placement, structural types, number and size of political signs, and severed eleven other provisions it believed to be unconstitutional. <u>Id</u>. at 149-151.

The only question presented on National's subsequent appeal was whether the district court's severance was proper. The Second Circuit reversed, holding that severance was improper "when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended." <u>Id</u> at 148. The court concluded that the ordinance must be redrafted and "the Town of Niagara, not this court, should do it. . . . We are particularly hesitant to undertake revisions of the ordinance in light of the fact

that we are a federal court interpreting a local ordinance. The interests of federalism and comity dictate conservatism in imposing our interpretive views on state statutes." Id. at 151. The Court of Appeals thereupon reversed the district court insofar as its efforts to save the statute were concerned, and affirmed with respect to the declaration of unconstitutionality.

In like fashion, remand from the United States Supreme Court, the California Supreme Court, in Metromedia, Inc. v. City of San Diego, 649 P.2d 902, 909 185 Cal. Rptr. 260 1982), concluded that the City of San Diego's sign ordinance was void in its entirety, despite the presence of a severability clause.

It is noteworthy that the U.S. Supreme Court's plurality opinion had instructed the California courts that they could uphold the San Diego ordinance by construing it to apply only to commercial signs. The California Supreme Court, upon the remand, found itself unable to accept the suggestion because the structure of the San Diego ordinance clearly prohibited such an interpretation. The San Diego ordinance spoke only in terms of permitted and prohibited signs, and only those signs that made reference to messages related to the products sold or the activities conducted at their locations were permitted. All others, save for a limited number of enumerated exceptions, were prohibited. Metromedia, 649 P.2d at 903 n.1. The ordinance authorized "signs designating the name of the owner or occupant of the premises . . . or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises," Id. at 905. The ordinance expressly proscribed any sign which "advertises or otherwise directs attention to a product, service or activity, event, person, institution or business . . . conducted, sold, manufactured, produced or offered elsewhere than on the premises where such sign is located." Id. The court construed such an ordinance as intended to prohibit all off-premises

-8-

signs, including billboards, containing both commercial and non-commercial messages. Id. at 906-07.

The California Supreme Court pointed out that the city's concern was with the structure, not the message. Id. at 906. The ordinance, as was the case with the 1997 sign code of Wilton Manors, was intended to eliminate signs which endangered the health, safety and welfare of the public and which blighted the aesthetic character of the city. The ordinance sought as a consequence to ban all structures except on premise advertising displays. Id. at 906-07.

To preserve the constitutionality of the ordinance (according to the plurality's suggestion in the U.S. Supreme Court's opinion) the California Supreme Court stated that it would have had to limit the scope of the San Diego ordinance to a prohibition of commercial signs and no others (as Judge Zloch did in Adventure Outdoor Advertising v. City of Pompano Beach, Fla., Case No. 96-6196-CIV-ZLOCH (S.D. Fla. Nov. 16, 1999), on appeal to the Eleventh Circuit). It could not do so, said the California Supreme Court, because this was a task for the legislature. To do so would have been inconsistent with the language of the ordinance, from which the court gleaned the intent of those enacting it. Id. at 906.

It was evident, said the court, that noncommercial speech as well as commercial speech was intended to be affected, and it pointed to an exception (similar to Wilton Manors') for temporary political campaign signs. Id. at 907. From this the court concluded that the City of San Diego had intended to include noncommercial messages in its ban, and that severance would bring about an ordinance quite different from that contemplated by the legislature at the time of the original enactment. Id., at 909.

Similar reasoning led to the refusal of the Second Circuit to authorize severance of the offending provisions of the ordinances held unconstitutional in National Adver. Co. v. Town of Babylon, 900 F.2d 551 (2d Cir.), cert. denied, 498 U.S. 892 (1990), as well as in National Adver. Co. v. Town of Niagara, 942 F.2d 145 (2d Cir. 1991), discussed supra.

In Metromedia, Town of Niagara and Town of Babylon, each ordinance had dealt comprehensively with both commercial and noncommercial speech, in each ordinance reviewed, a general prohibition of off-premise signage was ameliorated by the allowance of certain specified noncommercial subjects of speech. The holding of each decision was that: (1) the general prohibition of off-premise signs amounted to a favoring of commercial on-premise signage over the claims of noncommercial speech; and (2) the statutory exceptions for various forms of noncommercial signage were not content-neutral, in other words, the city was "picking and choosing" the subjects of noncommercial speech it would allow to be exhibited.

The law in this Circuit is in accord with these decisions. The decision in National I was followed by the Eleventh Circuit in Dimmitt v. City of Clearwater, 985 F.2d 1565 (11th Cir. 1993). In Dimmitt, the Court upheld a challenge by an automobile dealer who had displayed 23 American flags in violation of the City of Clearwater's sign code limiting the number of flags that could be flown on non-residential property to two. Id. at 1568. The City of Clearwater's sign ordinance contained an exemption which only applied if the flags "represent[ed] a governmental unit or body," Id., and as a consequence discriminated against flags displaying, for example, the Greenpeace logo or a union affiliation. The Eleventh Circuit found the ordinance unconstitutional as a content-based regulation of noncommercial speech, and held:

-10-

Solomon and National Advertising illustrate that a municipality may not accomplish its purposes in promoting aesthetics and traffic safety by restricting speech depending upon the message expressed.

Id. at 1570.

The Court expressly refused to rewrite the clear terms of the statute in order to find a narrowed construction which might be constitutional, on the ground that to do so "would amount to . . . interference with the state legislative process . . ." Id. at 1572.

## STATEMENT OF CONTROVERTED MATERIAL FACTS

1.  Street Systems denies the matter alleged at paragraph 4 of the City's statement of material facts, that: "...each of the six billboards would be equipped with a tri-vision face which would allow each side of the sign to display on a rotating basis three separate messages per side or a total of six messages per billboard." The copies of the permit applications attached as Exhibit C to the City's motion reflect that only one of the six permit applications was for a tri-face sign. This information appears on the first page of the first of the six permit applications provided in Exhibit C, under the heading "Sign Data" in the top right corner of the page, by the addition of the word "tri-face" opposite a box checked for the category "Other," for the first permit application referencing an owner's name of Genevieve Newstreet, Trustee, only.

2.  Street Systems denies the matters alleged at paragraph 6 of the City's statement of facts, that: "The City denied these applications because the proposed billboards would be in direct violation of the 1997 Sign Code which prohibited off-premise commercial signage and because the proposed structures exceeded the size, height and frontage requirements of the 1997 Sign Code." Firstly, the copies of five of the six permit applications attached as Exhibit C to the

-11-

City's motion for summary judgment reflect (on the bottom or right side of the first page of each permit application) the notation: "Denied Per 11-4 G2." Section 11-4 of the City's Sign Ordinance is entitled "Prohibited Signs and Sign Device, " and subsection G.2. of Section 11-4 simply states: "The following signs are also prohibited: ...2. Billboards." Secondly, the City's sign ordinance in fact contains no regulations concerning height and area per side of signs in commercial districts, such as those applied for by SIS (see Schedule 4, Section 4). The City's incomplete quotation of Schedule 1 concerning "Pole Sign Regulations" (at page 16 of the City's memorandum of law in support of its motion for summary judgment) leaves out the terms stated in first and last columns of the Schedule. Under the heading "Use," the first column of Schedule 1 lists only two categories of allowable uses for pole signs: (1) "Retail Shopping Center Office Apt. Bldg. Hotel/Motel Restaurant;" and (2) "Community Facility Government uses." Under the heading "Special Conditions," the last column of Schedule 1 states the following limitations on the two listed allowable uses: (1) "Outparcels: see Monument Regulations in Schedule 2;" and (2) "Copy limited to name of use and address." Read as a whole, the City's Pole Sign Regulations apply only to on-premise commercial signs.

      3. Street Systems denies that the City's 2000 sign ordinance, Ordinance No. Z-212, was amended on January 25, 2000, as alleged at paragraph seven of The City's statement of material facts. The copy of Ordinance No. Z-212 attached as Exhibit E to the City's motion for summary judgment reflects that only the first reading of the ordinance occurred on January 25, 2000, and that the second and final reading of the ordinance occurred on February 8, 2000. Pursuant to Section 166.041(3)(a), Florida Statutes, except for emergency ordinances "... a proposed

ordinance may be read by title, or in full, on at least two separate days...;"[5] and pursuant to Section 166.041(6), Florida Statutes, "... a municipality shall not have the power or authority to lessen or reduce the requirements of this section...."

4. Street Systems denies the matters alleged at paragraph nine of the City's statement of material facts, that: "Regulation of billboards, general and off-premise signs furthers the sign code's stated objectives of improving pedestrian and vehicular safety and preserving the continued attractiveness of the community." These matters are conclusions unsupported by any record evidence.

## CONCLUSION

For the reasons stated in this response and in Street Systems' memorandum of law in support of its motion for summary judgment, the City's motion for summary judgment should be denied.

Respectfully submitted,

Gary R. Rutledge
Florida Bar No. 222674
John R. Ellis
Florida Bar No. 041976
Rutledge, Ecenia, Purnell & Hoffman, P.A.
P. O. Box 551
Tallahassee, Florida 32302
(850) 681-6788 (Telephone)
(850) 681-6515 (Telecopier)

[5] The identical terms are incorporated in Section 9(c) of Chapter 1 of the City's Code of Ordinances.

-13-

and

Myron D. Cohen
Hunton & Williams
200 Park Avenue
New York, New York 10166
(212) 309-1000 (Telephone)
(212) 309-1100 (Telecopier)

Attorneys for Plaintiff,
Wilton Manors Street Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished to the following by United States Mail, this 18th day of September, 2000:

Michael T. Burke, Esq.
Johnson, Anselmo, Murdoch, Burke
      & George
790 East Broward Boulevard, Suite 400
P. O. Box 030220
Fort Lauderdale, FL 33303-0220

_John R. Ellis_
John R. Ellis

-14-