UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6186-CIV-UNGARO-BENAGES

WILTON MANORS STREET SYSTEMS,
INC.,

      Plaintiff,

vs.

CITY OF WILTON MANORS,

      Defendant.

_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Plaintiff, Wilton Manors Street Systems, Inc. ("Street Systems" or "plaintiff"), respectfully submits the following proposed findings of fact and conclusions of law on its claims against defendant, the City of Wilton Manors ("the City" or "Wilton Manors"), pursuant to S.D.Fla.L.R. 16.1, the Order Setting Initial Planning and Scheduling Conference entered on March 7, 2000, and the Order Enlarging Time entered on September 12, 2000.

**PROPOSED FINDINGS OF FACT**

1. Street Systems, like its predecessor in interest, Street Information Systems, Inc. ("SIS"), is a Florida corporation which is in the business of outdoor advertising. Outdoor advertising companies lease or purchase real estate on which to erect and maintain billboards, and in turn lease space on billboards to persons or entities wishing to communicate messages to the general public. Customers of outdoor advertising companies use billboards for communicating both commercial and noncommercial information.

2. During 1999, SIS obtained leasehold interests in five sites and an ownership interest in a sixth site in the City of Wilton Manors on which SIS intended to erect billboards. Each of these sites is in an area zoned for commercial use. All of the proposed billboards are intended to carry both commercial and noncommercial messages unrelated to the products sold or activities conducted at the locations; that is, the signs are intended to carry "off-premise" as opposed to "on-premise" advertising.

3. On July 8, 1999, SIS submitted six applications to the City for building permits to erect billboards on the six sites. Each of the applications was accompanied by construction plans reflecting compliance with state and federal requirements concerning the size, height, lighting, and spacing of outdoor advertising, pursuant to Section 479.02, Florida Statutes.

4. On August 10, 1999, the City notified SIS that all of the applications had been denied because the City's 1997 sign ordinance prohibited billboards, and because the City believed that the applications did not conform to applicable regulations in the City's sign ordinance concerning the height and size of free standing signs.

5. On September 1, 1999, plaintiff's counsel wrote to the City Manager of Wilton Manors, notifying the City of plaintiff's claim that the 1997 sign ordinance was unconstitutional. The letter requested an opportunity to meet with the City Attorney to discuss the matter and asked that any further action relative to SIS's permit applications be held in abeyance pending such a meeting, or alternatively that the letter be considered a request for a review of the City's decision.

6. The City responded by letter of October 1, 1999 from its City Attorney, declaring that it was the City's desire to resolve the matter amicably and requesting further information as to the specific provisions of the City's sign ordinance which the plaintiff deemed to be unconstitutional.

2

7. Plaintiff's counsel replied to the City by forwarding an opinion letter dated November 22, 1999 with an accompanying memorandum of law, and a subsequent opinion letter dated December 22, 1999. The opinion letters and memorandum addressed what plaintiff construed to be the constitutional shortcomings of the City's sign ordinance.

8. Armed with the information forwarded by plaintiff, the City took steps to revise its 1997 sign ordinance to cure the constitutional infirmities which plaintiff had pointed out. Minutes of a City Council meeting of January 25, 2000 note that the City Attorney had "contacted the Florida League of Cities and they have agreed to review our existing ordinance as amended and the correspondence that we have been receiving from a New York law firm regarding a possible constitutional challenge."

9. The City's sign ordinance in effect when SIS applied for the six permit applications on July 8, 1999, consisted of Ordinance No. Z-199, enacted on May 27, 1997, as amended by Ordinance No. Z-205, enacted on February 10, 1998. The stated purpose of the 1997 sign ordinance was to advance the City's interests in health, safety and welfare, in architectural compatibility, and in the efficient transfer of information.

10. On January 25, 2000, the City's amendatory sign ordinance No. Z-212 had its first reading.

11. On February 4, 2000, plaintiff's complaint was filed in this Court. Plaintiff's complaint attacks the constitutionality of the City's 1997 Sign Ordinance and seeks a declaratory judgment and a permanent injunction against the enforceability of the City's 1997 sign ordinance, and injunctive relief directing the City to follow its usual and customary processes and ministerial duties in connection with the issuance of any lawful building or sign permits to plaintiff.

12. On February 8, 2000 the City's amendatory sign ordinance No. Z-212 had its second reading and was enacted into law.

13. By a resolution dated July 28, 2000, SIS transferred to Street Systems all right, title and interest in the six permit applications filed by SIS with the City. By an Order entered on August 18, 2000, Street Systems was substituted in place of SIS as the plaintiff in this action.

## PROPOSED CONCLUSIONS OF LAW

1. In the present lawsuit, the City claims that its recent revisions to its 1997 sign ordinance have insulated it from constitutional challenge and mooted the action. If, however, the 1997 ordinance was void in its entirety, then under Florida law Street Systems possesses vested rights to construct the signs it sought prior to amendment, and the action is not mooted. National Adver. Co. v. City of Fort Lauderdale, 934 F.2d 283 (11th Cir. 1991), and after remand, 8 F.3d 36 (11th Cir. 1993) ("National II"); See, Smith v. City of Clearwater, 383 So.2d 681-689 (Fla. 2d DCA 1980), Bhoola v. City of St. Augustine Beach, 588 So.2d 666, 667 (Fla. 5th DCA 1991), Harris v. State, 31 So.2d 264, 266 (Fla. 1947), City of Margate v. Amoco Oil Co., 546 So.2d 1091, 1094 (Fla. 4th DCA 1989). Cf. Revolution, Inc. v. City of Casselberry, (11th Cir. Sept. 29, 2000) slip opn. at 3.

2. In Adarand Constructors, Inc. v. Slater, the Supreme Court stated that the dismissal of the action before it on the ground of mootness "would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." 120 S. Ct. 722, 726. Accord: City of Erie v. Pap's A.M., 120 S.Ct. 1382 (2000).

3. It is clear that Street Systems in the case at bar continues to need judicial protection. Because the City failed to grant the requested permits Street Systems has lost-- and continues to lose-

4

- revenues which would be generated by the billboard rentals. See, e.g., Parking Ass'n of Ga., Inc. v. City of Atlanta, Ga., 515 U.S. 1116, 1116 (dissent to denial of writ of certiori; noting that petitioners "will lose revenue due to. . . lost advertising dollars" where a city ordinance required trees that would obscure signs), reh'g denied, 515 U.S. 1178 (1995); see also Town of Gulf Shores v. Lamar Adver. of Mobile, Inc., 518 So. 2d 1259, 1260-61 (Ala. 1987) (advertising company prohibited from constructing billboards due to municipality's unlawful enforcement of zoning ordinance was entitled to damages based on advertising revenue it had lost from time construction was stopped). It should also be noted that Street Systems' public service partners, who would have access to the proposed signage for the display of noncommercial messages which benefit the community, have themselves lost the ability to make use of a valuable medium of communication.

4. Accordingly, I find that examination of the 1997 Wilton Manors sign ordinance is required because if the ordinance was unconstitutional, then under Florida law Street Systems has vested rights to construct the signage sought.

5. The City's 1997 sign ordinance was a comprehensive regulatory scheme governing the erection of signs within the jurisdiction of the City. Both commercial and noncommercial speech were subject to the strictures of the code, which dealt with the use of commercial signs, political campaign signs, signs for places of worship, public institutions and points of interest, signs relating to the names of neighborhood civic associations, governmental information signs, historical markers and decorations and festoons of light.

6. The definition of a "sign" was all-embracing: it was described in Section II-2 (26) of Article II as any structure that made use of a writing to "communicate information of any kind to the public" and the purpose of the Article was stated to be to "facilitate and efficiently transfer

5

information" in a manner which would not "endanger the health, safety and general welfare of the public."

7. The City's sign ordinance contained no ambiguity concerning its treatment of signs carrying non-commercial messages. The structure of the ordinance clearly considered signage carrying noncommercial speech as encompassed within its terms. The framers of the ordinance took care to determine that certain subjects of noncommercial speech, though clearly off-premise, could be erected. § II-5(C), for example, expressly authorized temporary political campaign signs, an example of noncommercial speech which would not need specific authorization if the ordinance were to apply only to commercial signage. In similar fashion, § II-5(A)(6)(a) authorized signs for places of worship, public institutions and points of interest; § II-5(A)(6)(b) permitted signs relating to the names of neighborhood civic associations; § II-3(C)(1) permitted governmental information signs; and § II-3(C)(2) authorized the erection of historical markers. Other noncommercial signage supporting a cause which was not the subject of an election ballot was prohibited as "off-premise" unless a City official determined that such signage represented a "permanent political sign." §II-5(C).

8. The statutory language used by Wilton Manors leaves no room for doubt that the ordinance was designed to allow merchants to advertise an on-premise commercial message, defined in § II-2(8) as a sign that "directly or indirectly names, advertises or calls attention to a business, product, service or other commercial activity", while prohibiting a business or individual from calling attention to a product or service or idea which bore no relation to the activities upon the premises where the sign was located. Accordingly, the thrust of the ordinance was to authorize permanent on-premise commercial signs while completely banning permanent off-premise noncommercial as well as commercial signs (with specified exemptions for certain categories of

noncommercial speech). As such, the ordinance contained the constitutional infirmities afflicting the billboard ordinance reviewed by the United States Supreme Court in <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 494-96 & n.3 (1981): commercial on-premises signs were allowed; noncommercial off-premises messages were prohibited.

9. In similar fashion, the City violated the principles established in <u>Metromedia</u> by "picking and choosing" among the subjects of noncommercial speech it would allow on signage in the City. In most instances, whether off-premises noncommercial signs were exempted or prohibited turned on whether or not they conveyed messages approved by the ordinance. § II-5(C), for example, expressly authorized temporary political campaign signs; other noncommercial signage supporting a cause which was not the subject of an election ballot was prohibited as "off-premise" unless a City official determined that such signage represented a "permanent political sign" §II-5(C); § II-5(A)(6)(a) authorized signs for places of worship, public institutions and points of interest; § II-5(A)(6)(b) permitted signs relating to the names of neighborhood civic associations; § II-3(C)(1) permitted governmental information signs; and § II-3(C)(2) authorized the erection of historical markers. Yet "decoration and festoons of light" signage was limited to "recognized holidays".

10. The ordinance also violated the principles expressed in the United States Supreme Court's decision in <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410, 417 (1993), where the Court disallowed restrictions on commercial speech because of the failure of the regulation to support the government's purpose in enacting it. The distinction drawn in the ordinance between on-premise and off-premise advertising bore no relationship to the City's asserted interests in traffic safety and maintaining an attractive appearance. A sign causes the same environmental impact whether it is designated "on premise" or "off-premise": if it interferes with a view or impacts upon

traffic control when it describes a product that is not sold on the premises, it is irrational to conclude that the sign will not present the same problems when it advertises a product sold on-site. As the court held in Outdoor Sys., Inc. v. City of Merriam, Kan., 67 F. Supp. 2d 1258, 1267 (D. Kan. 1999), a case involving a similar ordinance:

> Defendant has not shown, or even argued, any aesthetic or traffic safety distinction between these various types of signs. The Court is not aware of any aesthetic or traffic safety difference between a "Vote for Joe" sign (which is restricted to 30 days) and a "Joe's Pizza" sign (which may be permanent).

11. In any case, less restrictive means were available to the City to advance its interests, such as through limitation of all signage per lot, dimensions or location without the need to address sign content.

12. The ordinance further violated constitutional standards in its treatment of political speech. Its provisions clearly treated commercial signage more favorably than temporary political signage. Durational limitations and fines or imprisonment for violation of the code provisions concerning removal were not imposed on any commercial on-premise signs which merchants were permitted to erect to permanently advertise the wares sold on their premises. Moreover, political signs were treated in different ways depending wholly on their content. For example, political signs concerning current campaigns were permitted, but issues of a political nature without reference to matters on a ballot could be subject to prohibition.

13. Finally, the 1997 Wilton Manors sign ordinance also lacked any standards to guide the discretion of the officials administering it when construing a "political" message sought to be erected on a sign, much less narrow, objective and definite guidelines. What of an issue raised during an election campaign that had ended? Must a sign referring to that issue be removed on pain

8

of fine or imprisonment pursuant to the provisions governing temporary campaign signs? Might it remain as a "permanent political sign"? Or should it be regarded simply as an "off-premise" sign prohibited completely by the ordinance? A building inspector confronted with this problem would receive no guidance from any of the ordinance's provisions. See, e.g., Staub v. City of Baxley, 355 U.S. 313, 322 (1958); accord Drexel v. City of Miami Beach, 64 So. 2d 317, 319-20 (Fla. 1953) (en banc); United States v. Frandsen, 212 F.3d 1231 (11th Cir. May 25, 2000).

14. The City requests this Court to sever the challenged provisions leaving intact only "the remaining, effective portions of the ordinance." For this proposition, the City relies upon the presence of a severability clause in the 1997 ordinance. The presence of a severability clause is not, however, dispositive. See United States v. Jackson, 390 U.S. 570, 585 n.27 (1968) (the ultimate determination of severability will rarely turn on the presence or absence of a severability clause). As the Supreme Court stated in Reno v. ACLU, 138 L.Ed.2d 874, 117 S.Ct. 2329, 2351 n.49 (1997), "A severability clause is 'an aid merely; not an inexorable command'" (citation omitted).

The courts hold severance inappropriate when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended. National Adver. v. Town of Niagara, 942 F.2d 145, 148 (2d Cir. 1991) (finding sign ordinance unconstitutional and unsuited for severance because dissociating eleven provisions would leave large gaps in the ordinance, notwithstanding the general severance provision); see also In re New York State Superfund Coalition, Inc., 75 N.Y.2d 88, 94, 550 N.Y.S. 2d 879, 881 (1989) (judicial excision is inappropriate where the potentially severed section is a core part of, and interwoven inextricably to, the entire regulatory scheme). Additionally, the party seeking to uphold a restriction on commercial speech has the burden of justifying it. Bolger v. Young's Drug Products

9

Corp., 463 U.S. 60, 71 at fn. 20, 103 S.Ct. 2875, 2882, 77 L.Ed. 2d 469 (1983).

15. In the case at bar, the 1997 Wilton Manors sign ordinance was neither drafted nor enacted in separate "parts" which discretely banned commercial and non-commercial off-premises signs, either of which might be stricken independently of the other. No part of the ordinance alludes in any way to a substantive distinction between commercial and non-commercial messages. Section II-4(G)(4) simply bans all off premises signs. Nor can such a substantive distinction be read into it without gratuitously supplementing the language prohibiting off-premises signs with the phrase "except for off-premises signs bearing non-commercial messages." Therefore, as this Court cannot say with certainty that the framers envisioned § 11-4(G)(4) as anything but a unitary "part" of the ordinance, the severability clause avails the City nothing. Ackerly Commun. of Mass., Inc. v. City of Cambridge, 135 F.3d 210, 215-16 (1st Cir. 1998).[1]

16. When the sign ordinance is read in its entirety, giving full force to all of its provisions, the ordinance both allows and prohibits the non-commercial speech authorized by the proposed amendment. In other words, the language that the City suggests would be a way of meeting the Metromedia standard may be nullified by other provisions in the sign ordinance. Window signs, for example, have copy expressly limited to the name of the commercial use and/or hours of operation (see § II-3(F); copy on pole signs is limited to the name of the premises or use(s) of the property and generic words or symbols which describe products or services (see § II-3(P); copy on temporary signs is limited to the uses permitted in the zoning district in which the property

---

[1] The First Circuit noted in Ackerly that if a court is unable to know whether the legislature would have enacted a particular bill without the unconstitutional provision, it should not sever the unconstitutional provision, but rather should strike the entire statute. 135 F.3d at 215.

is located (see § II-5(3); all temporary signs which pertain to a time, event or purpose which is no longer imminent or pending must be immediately removed (see § II-5(6); temporary political signs require a cash bond, which may be forfeited id such signs are not removed within 15 days after termination of an election (see § II-5(C); decorations and festoons of light are limited to recognized holidays (see § II-5(E); accessory signs have copy limited to the uses permitted in the zoning district in which the property is located (see § II-5.1(1); signs on private property relating to the name of a neighborhood civic association are allowed but only if recognized by the city clerk as representing a neighborhood in the city or subdivision (see § II-5.1(6)(b); and Schedule 4, regulating the principal use of signs in the various districts, mandates only signs with copy limited to the name of the building or the main permitted uses for each street frontage.

17.   Grafting language onto the body of this sign law would have effects not contemplated by its drafters. The same off premises non-commercial signs the City would allow, through § II-4(G)(4) if judicially amended, it would prohibit when the content based exemptions for on premise signs are read. The ordinance becomes impossible to interpret as there are no clear standards for how it will be applied, i.e., it is not known what signs will be allowed and what signs will be prohibited because of the signs' content. As the court noted in <u>Revere National Corp. v Prince George's County</u>, 819 F. Supp. 1336, 1346 (D. Md. 1993), "The County is caught between the rocks of incoherence and the shoals of constitutional standards it cannot meet."

18.   I find that the 1997 City of Wilton Manors sign ordinance was unconstitutional in it entirety. As <u>National II</u> makes clear, "When an application for a permit satisfies all existing and pending laws, the permit must then issue; a new law passed after the application was filed has no effect on the matter of issuance." Slip opn. at 6. In the case at bar, all permit applications were filed

by SIS at a time when no constitutionally valid sign ordinance was in effect in the City of Wilton Manors. Street Systems has succeeded to all right, title and interest in the applications filed by SIS. As a consequence, this Court has authority to order defendant to follow its usual and customary processes in issuing the requested six building permits to Street Systems.

Respectfully submitted,

*/s/ John R. Ellis*

Gary R. Rutledge
Florida Bar No. 222674
John R. Ellis
Florida Bar No. 041976
Rutledge, Ecenia, Purnell & Hoffman, P.A.
P. O. Box 551
Tallahassee, Florida 32302
(850) 681-6788 (Telephone)
(850) 681-6515 (Telecopier)

and

Myron D. Cohen
Hunton & Williams
200 Park Avenue
New York, New York 10166
(212) 309-1000 (Telephone)
(212) 309-1100 (Telecopier)

Attorneys for Plaintiff,
Wilton Manors Street Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished to the following by United States Mail, this 10th day of October, 2000:

Michael T. Burke, Esq.
Johnson, Anselmo, Murdoch, Burke
    & George
790 East Broward Boulevard, Suite 400
P. O. Box 030220
Fort Lauderdale, FL 33303-0220

                                          John R. Ellis

F:\USERS\JELLIS\street.wiltoncon